IRVING, J.,
Dissenting:
¶ 28. I disagree with the majority’s conclusion that Knox’s constitutional right against double jeopardy was not infringed when he was required to stand trial a second time for the same crime. The majority finds that no jeopardy emanated from the first trial because a manifest necessity arose which justified the premature termination of that trial. That “manifest necessity,” in the majority’s view, was the discovery by the prosecution that its first witness was unrepresented by counsel and had made several incriminating statements.[1] The record, in my judgment, does not lend any support to the finding that a manifest necessity existed, warranting the premature termination of Knox’s first trial. Therefore, I respectfully dissent.
¶ 29. As I have already noted, the majority’s decision is premised on the notion that the giving of self-incriminating testimony by an uncounseled witness constitutes a manifest necessity for declaring a mistrial in the trial of another, in this case Marlon Knox. This reasoning is utterly flawed. By definition, the phrase “manifest necessity for the declaration of a mistrial” suggests that there are some readily seen or understood reasons why the trial cannot continue. What is readily apparent about a witness’s self incriminating statements compelling the conclusion that the utterance of such statements erects an impregnable fortress in the onward path of the trial of the accused? If the witness has already incriminated himself, can the incrimination be undone? When the defendant’s second trial is held, will not the witness’s prior incriminating statements against himself be just as incriminating. If indeed the prosecution was really concerned about having unwittingly taken ad *1011 vantage of the witness by having the witness give uncounseled, self-incriminating statements, then the solution would be not to use the witness’s incriminating statements against him in the witness’s trial, not to terminate the defendant’s trial.
¶ 30. It seems rather clear to me, from my reading of the record, that the real reason the prosecution wanted to terminate Knox’s first trial was not because the witness, Jermaine Williams, incriminated himself, but because Williams refused to incriminate Knox. The prosecution’s displeasure with Williams had its genesis in the prosecution’s lengthy effort to get Williams to admit that, in an earlier incident at the 504 Club, the victim, Willie James McGill,[2] had thrown a bottle and struck Knox on the head or shoulder. Of course, the significance of this evidence is that it would establish a clear motive for Knox’s subsequent killing of McGill. After Williams grudgingly admitted that McGill had indeed struck Knox with a bottle, the prosecution embarked upon the unsuccessful task of getting Williams to admit that a day later Knox got revenge by shooting McGill in an unprovoked attack. At the risk of overburdening the record, I must quote generously from the trial transcript which places in perspective and context the prosecution’s motion for a mistrial.
¶ 31. Immediately prior to the request for a mistrial, the following exchanges occurred:
Q. Okay. That’s fíne. Is that the only incident that involved Willie James McGill that evening?
A. That evening, yes.
Q. Okay. Now, I want to refresh your mind, if I could, please, to a point in time, being the next day. Were you supposed to go to work the next day?
A. Yes, but we had overslept.
Q. Who is “we”?
A. Me and Knox.
Q. What about Charles McKinney? Did he—
A. He come by to get us, but we didn’t go.
Q. I see. When you say “we didn’t go,” you didn’t go to work.
A. We didn’t go to work.
Q. I see. Was there a time later in the day when you saw Charles McKinney?
A. When he got off.
Q. How long does he usually work?
A. Eight to ten hours, like every day.
Q. Do you recall what time of the day or night—
A. No, sir.
Q. —that you saw Charles McKinney after he got off?
A. No, sir.
Q. Where did you see him when he got off?
A. At my house.
Q. And who was there when Charles McKinney arrived?
A. Me, my sister, Jameka Rouse, and that’s it. My baby.
Q. What about Knox?
A. Yes, he was there, too.
Q. Help us here. Knox was there.
A. Yeah.
Q. All right. Now, what, if anything, did you and Knox and McKinney do?
A. We rode to the store to get a blunt.
*1012 * * * *
Q. That’s what you were going to the store for. That’s what you said; right?
A. Right.
Q. Okay. On the way to the store, did anything unusual happen?
A. Other than we stopped the gun—we stopped the ear.
Q. Who was driving the ear?
A. To get the weed.
Q. Who was driving the car?
A. Charles McKinney.
Q. And where were you seated in the car?
A. In the back.
Q. You were in the back? Are you sure?
A. Yes.
Q. And where was Mr. Knox?
A. In the front.
Q. In the front—
A. Passenger side, the passenger side.
Q. In the passenger side. I see. Was it a two-door or a four-door?
A. Four-door.
Q. What type of car was it?
A. A Pontiac, a white Pontiac.
Q. I see. And the white Pontiac was a Grand Am or something like that?
A. Yes.
Q. All right. Did you have an occasion on the way to the store to stop off somewhere?
A. Well, to get the weed.
Q. Who said stop the car?
A. Knox.
Q. Was the car stopped?
A. Yes.
Q. Who got out of the car?
A. Knox.
Q. Did you get out of the car?
A. No, sir.
Q. Did McKinney get out of the car?
A. No, sir.
Q. Did you have a gun on you at that time?
A. No, sir.
Q. So far as you knew, did Knox have a gun?
A. No, sir.
Q. Didn’t know whether he had a gun, or not.
A. No, sir.
Q. You’re sitting in the car. What’s the next thing you know happened?
A. I heard a gunshot.
Q. How many shots did you hear?
A. Five or six.
Q. All right. After you heard the gunshots, what did you do?
A. Got down. Like anybody would have got down, huh?
Q. Once you get [sic] down, did you just stay down?
A. Until I didn’t hear no more.
Q. What did you do when you didn’t hear anymore?
A. I got up.
Q. Okay. What did you do then?
A. We rode off.
Q. Who is “we”?
A. Me, Knox, and Charles.
Q. Did you have any type of a curiosity to ask Knox—
A. Yes, sir.
Q. —what happened?
A. Yes, sir.
Q. What did he say happened?

A. He shot in the air. I mean, it wasn’t, it wasn’t nothing. I mean, I didn’t know, I didn’t know if nobody had got shot.

Q. Okay.
*1013 A. But I heard a lot of gunshots. I mean, I heard about five or six gunshots.
Q. But he didn’t say anybody shot at him. Right?
A. I didn’t hear him say nothing but he shot in the air.
Q. That’s what I mean. He never told you that anybody shot at him. Right?
A. No, sir.
Q. All he said was, “I shot in the air.”
A. No, sir. That—that’s all he said.

Q. Did you ask him ivhy?

A. No. Because it happens all the time, really.
Q. You’re involved in gunshots all the time?
A. No. I’m around gunshots all the time—people shooting.
Q. So, it’s just not that big a deal to you.
A. No.
Q. Okay. You, Knox, and Charles McKinney are in the car leaving now.
A. Yes;
Q. Where is Knox in the car?
A. Knox is in the front seat.
Q. Where is McKinney in the car?
A. He in the driver seat.
Q. Where are you in the car?
A. In the back seat.
Q. Did you see a gun then?
A. No, sir.
Q. So, he still didn’t show you a gun.
A. No, sir.
Q. Well, did you think to ask him haw he shot in the air? Or what he shot in the air with?
A. Because I figured, if he shot in the air, he had a gun.
Q. I see. But you didn’t see one.
A. No, sir.
Q. All right. After that, where did you go?
A. Went to the store. Then we went to the trailer park.
Q. Now—
A. That’s where I got out at.
Q. The trailer park, though, that’s not where you were living; right?
A. No, sir.
Q. You were living at Tall Pines.
A. No, sir.
Q. You weren’t living at Tall Pines.
A. Yes, sir. Yes, sir, I was living at Tall Pines.
Q. All right, sir.
A. The reason—I had a friend that worked, that stayed out there that worked on my car. I had put a motor, a motor'—-a 400 in a Chevrolet.
Q. What was his name?
A. I really don’t remember his name. But I can get his name if you want me to.
Q. It’s not that important. Why did you get out at his house, or his trailer?
A. That’s where he was working at. That’s where he work at on my car. That’s where my car at.
Q. Arid you were just going to check on your car?
A. Yes, sir.
Q. At that particular point in time, did you know whether anybody had actually been shot?
A. No, sir, until a little bit later, about twenty minutes later.
* * * *
Q. Have you talked to him [Knox] since he has been in jail”
*1014 A. I talked to him on the phone.
Q. Okay. Did he tell you he shot the gun?
A. No, sir.
Q. Did he tell you that he shot at the guy?
A. No, sir.
Q. You didn’t ask him if he did?
A. No, sir.
Q. Weren’t you a little bit curious, if a guy was dead and shots had been fired in your presence, whether or not he had shot the gun?
A. I didn’t ask him and he didn’t tell me.
Q. You just stayed away from it all?
A. Yes, sir.
Q. Was there a point in time that you went down to the police station?
A. Yes, sir. I went down there the same—well, no. I didn’t go down there the same night. I went down there a few nights—after they had told me they needed me down there, I went down there.
Q. And you gave them a statement.
A. Yes.
Q. I know you don’t remember exactly what the statement was, but is it pretty much close to what you’re telling these folks today?
A. Yes, sir.
Q. Can you think of anything you left out of the statement, or out of your testimony here?
A. No, sir.
Q. And you eventually got charged with a crime, didn’t you?
A. Yes, sir.
Q. What did you get charged with?
A. Accessory.
Q. After the fact?
A. Yes, sir.
Q. And you are here testifying?
A. Yes, sir.
Q. You’ve got an attorney. Is that right?
A. No, I don’t have an attorney at present right now. I don’t have one, because I ain’t had—it’s just different, you know. But I ain’t, I don’t have one.
Q. What about Calvin Taylor?
A. Calvin Taylor was—I hired him, but I don’t have him right now. You know. I ain’t finished with the— it’s—
¶ 32. The above-quoted colloquy proves unequivocally that the prosecutor failed miserably to get Williams to even admit that he saw Knox with a gun, much less, that he saw Knox shoot McGill. Following this bout with the recalcitrant Williams, the record reflects that the following occurred:
BY MR. SAUCIER [THE PROSECUTOR]: I want to apologize to the Court. I was not involved in this case until just recently, but my understanding was, is that Mr. Taylor represented both Mr. McKinney and this gentleman, or I would have never called him to the stand. I feel like that I have violated his rights if he’s not being represented, but we contacted Mr. Taylor to have him here. And I never was told by Mr. Taylor that he’s not his attorney.
So I’m in a quandary here, because I have just gone and put a defendant on the stand, under oath, and he’s pretty much confessed to—or some could interpret it as being a confession. And I’m afraid that maybe we might need Mr. Taylor here to have some type of explanation, because if, in fact, he hasn’t, or isn’t being represented by Mr. Taylor, then probably I need to stop my exami *1015 nation of him until he’s fully advised of his rights.
BY THE COURT: Does Mr. Taylor represent you?
BY THE WITNESS: No, sir. I hired him. You know, I was working at the time, but a lot stuff came down on me at one time and I couldn’t, you know, I couldn’t really manage to keep on paying him, you know, like I had supposed to.
BY THE COURT: I don’t even know, has he been indicted for this?
BY THE WITNESS: Yes, sir.
BY THE COURT: You have?
BY MR. SAUCIER: (Nodded, indicating yes.)
BY THE COURT: I’m not aware of Mr. Taylor- — ■
BY MS. MARTIN: Your Honor, I have spoken with Mr. Taylor, and he informed me that he did represent this person and the other person, except for he hasn’t finished paying him all the way. I believe that’s—
BY THE WITNESS: But he not my lawyer right now.
BY MS. MARTIN: He’s not your lawyer anymore.
BY THE COURT: That’s right.
BY MS. MARTIN: Okay.
BY THE WITNESS: I ain’t paid him. How he going to be my lawyer? You know what I’m saying? He don’t talk to me.
BY THE COURT: Well, unless he’s been given an order by the Court to withdraw, which I’m not aware whether he has, or not, he is still your lawyer until the Court allows him to withdraw. I guess we could check the court file on that or either call Calvin Taylor and—
BY MR. SAUCIER: If he has made an entry of appearance, then I would assume he is still the lawyer.
BY THE WITNESS: That’s what I paid for, the entry of appearance.
BY MR. SAUCIER: And I know that he’s made an entry of appearance, because we have given him discovery.
BY THE COURT: Oh, is that right?
BY MR. SAUCIER: Yes, sir. We’ve given Calvin discovery on both of these guys.
BY THE COURT: Let’s take a break and I’ll call Mr. Taylor.
BY MR. SAUCIER: I apologize. I’m sorry.
* * * *
BY THE COURT: I spoke with Calvin Taylor and he said that he represented McKinney in the Circuit Court. As to this gentleman here, Williams, he said that he had represented him at the preliminary hearing. And he pulled his file and he said he didn’t know if he had entered anything here, or not, but his file didn’t indicate that he had. And he hasn’t spoken to him about this case or anything such as that. And he would be glad to come over in the morning if we needed him, or whatever, you know. But ... so, he has not consulted with him about testifying or anything such as that.
BY MS. MARTIN: Your Honor, several months ago Mr. Taylor actually approached me and, about them, both of them testifying, Mr. McKinney and Mr. Williams. He told me that he represented both of them. And he brought Mr. McKinney up to the courthouse, and we spoke about both of his clients and both of their involvement and them testifying. And so—
BY THE COURT: I don’t know what he — he told me that, he acknowledged that you had talked to him about McKinney, and he said he, I think he got him *1016 to come here today from wherever he was, New Orleans. He said that he told you he didn’t know where this gentleman was, he hadn’t been by to see him. And he didn’t know how to get in touch with him.
BY MS. MARTIN: That’s correct, and I gave him his phone number. I said, well, I had accidentally just called him at a phone number that I was looking for a witness, and Jermaine answered the telephone there and this is his phone number.
BY THE COURT: All right. Well, why don’t we do this? You all can get together with Mr. Taylor then between now and in the morning and decide what you want to do, and we’ll just take a recess at this point. And I’ll tell the jury that we’re going to recess for the day.
[[Image here]]
BY MR. SAUCIER: Your Honor, on that particular case, it’s come to our attention that there was some miscom-munication about the relationship with Jermaine Williams to being represented, [sic] or whether he was represented by an attorney, and because of that ambiguous situation and because of his apparent misunderstanding of whether he was being represented or not, I feel compelled to ask for a mistrial, because we did put him on the stand and he was in a mental flux as to what his position was at the time. And I would ask that it be rescheduled, perhaps for the earliest convenience, to the next term.
BY THE COURT: All right. Is there any objection?
BY MR. SHADDOCK: No, Your Honor. BY THE COURT: All right. The Court wasn’t aware either one of these gentlemen were charged as accessories, and it came out just in the testimony without any prior knowledge by the Court so that the Court could give any type of instructions with respect to their right to testify or not testify and so forth, the warnings that should have been given.
Mr. Taylor, the attorney for one of the parties and who has represented the other witness at one time or another, was not here and should have been here, should have been here to represent his client.
So, with great reluctance — and, certainly I understand these things, you know, do happen, but I’ll grant the motion for a mistrial. I feel like that’s the appropriate thing to do in view of what’s transpired with respect to these witnesses. So, I’ll grant the motion for a mistrial, and the case will be rescheduled for trial at the next term of court.
¶ 33. The contention that — these facts present a manifest necessity for the declaration of a mistrial — is just not a tenable contention. As I have already alluded to, I cannot grasp the logic of why the witness’s precarious position created a manifest need to declare a mistrial in Knox’s trial. But even if there was some nexus or correlation between the witness’s precarious position and the appropriateness of going forward with Knox’s trial because of some inexplicable harm that might occur, it seems to me that there were clear alternatives to the declaration of the mistrial. First, the court could have appointed someone to represent Williams and continued with the trial. Second, the court could have advised Williams of his constitutional right not to incriminate himself or be compelled to be a witness against himself, and left it up to Williams to decide if he wanted to continue testifying. Third, the court could have ordered the prosecution not to use the witness’s incriminating statements *1017 against him in any subsequent trial of the witness.
¶ 34. In arriving at its position, the majority also says that “[b]oth the State and defense counsel felt that a mistrial should be granted.” I do not think that is a proper reading of the defense’s position. Defense counsel simply advised the court that he did not object to the granting of the mistrial. He gave no input during the discussion between the prosecutor and the court. To deduce from his statement— that he did not object to the mistrial being granted — that he felt that a mistrial should be granted is to overlook a very important consideration: a defense lawyer is duty and ethically bound to secure a win for his client by any legal means available. It is possible that defense counsel may have been of the view that the prosecution had committed misconduct in its effort to obtain a mistrial and that, under such circumstances, he could raise the double jeopardy claim later, even if he did not object when the motion for a mistrial was made. In other words, defense counsel may have wanted the mistrial not because he thought a manifest necessity existed for declaring one, but reasons just the opposite. If being silent while the prosecutor committed a grievous error would operate to his client’s benefit, he was duty bound to let the sounds of silence speak for him.
¶ 35. Apparently, the majority, while asserting that the defense counsel also felt that a mistrial should be granted, is not prepared to find that defense counsel’s willingness to permit a mistrial operated as a waiver of Knox’s right against being placed twice in jeopardy for the same offense. In this regard, the majority, citing Johnson v. State, 753 So.2d 449, 454(¶ 13) (Miss.Ct.App.1999), finds that the right to be free from double jeopardy is a constitutional right that is not subject to waiver.
¶ 36. Johnson cites Matlock v. State, 732 So.2d 168(¶ 10) (Miss.1999) for its bright line pronouncement that “double jeopardy is a constitutional right that is not subject to waiver.” Matlock, however, does not announce a bright line rule that the constitutional claim of double jeopardy can never be waived. It simply holds that a plea of guilty does not waive the claim of double jeopardy. Id. at (¶¶ 4, 11-12). Therefore, the question which must be answered, in the absence of Knox’s objection to the declaration of the mistrial, is whether the facts surrounding the motion for a mistrial represent prosecutorial maneuvering to obtain a mistrial, and thus a prose-cutorial advantage.
¶ 37. “A criminal defendant has a ‘valued right’ to have his or her guilt or innocence determined by the jury to which the prosecution’s case is first presented.” United States v. McIntosh, 380 F.3d 548, 553 (1st. Cir.2004) (citing United States v. Jorn, 400 U.S. 470, 484, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971)).
It is settled law that the Double Jeopardy Clause provides a defendant with a shield against prosecutorial maneuvering designed to provoke a mistrial. Oregon v. Kennedy, 456, U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982); [United States v.] Dinitz, 424 U.S. [600], 611, 96 S.Ct. 1075[, 47 L.Ed.2d 267] [(1976)]. Consequently, if the prosecutor purposefully instigated a mistrial or if he committed misconduct designed to bring one about, the Double Jeopardy Clause may be invoked as a bar to further prosecution notwithstanding the defendant’s consent (or failure to object) to the mistrial. See Creighton v. Hall, 310 F.3d 221, 227 (1st Cir.2002).
McIntosh, 380 F.3d at 557.
¶ 38. In my judgment, the prosecutor urged the mistrial upon the court for the improper motive or purpose of obtaining *1018 an advantage over the defense, that is, to obtain a fresh start with a new and different witness who perhaps would be a little more cooperative in offering damaging evidence against Knox. The transcript of Knox’s second trial lends support to this supposition. In the retrial, Williams was not called as a witness. Instead, the prosecution called Charles McKinney, Jr., the other person charged with being an accessory after the fact.
¶ 39. McKinney was more cooperative or at least offered more damaging information against Knox than did Williams. Further, it is significant that prior to the beginning of McKinney’s testimony the prosecution arranged for McKinney to advise the court that McKinney was willing to waive his right against self-incrimination and testify.
¶ 40. Surely the prosecution knew that Williams, like McKinney, was charged with being an accessory after the fact. Likewise, the prosecution knew that no defense lawyer was present when the prosecution first began its interrogation of Williams. The prosecution’s assertion that it was concerned about protecting William’s right against self-incrimination just does not pass muster in light of the fact that the professed concern did not arise until after Williams had completed his direct examination testimony and had failed to give the damaging testimony against Knox that the prosecution desired. The fact that Williams did not have counsel was not a bar to the prosecution’s advising the court, at the beginning of Williams’s testimony, that Williams was charged as an accessory after the fact.[3] At that point the court could have advised Williams of his rights and left it up to Williams to decide whether he wanted to testify. Since the prosecution did not act to protect Williams’s rights at the time when it really counted, I am compelled to conclude that the prosecution’s belated assertion of this as the reason for wanting a mistrial was clearly pretextual, masking its real reason for wanting the mistrial.
¶41. It is tragic in this case that a human life was lost for nothing, but it would be even more tragic if the rule of law was not adhered to, for a failure to adhere to the rule of law imperils the existence of both our nation and the freedoms which it offers. I believe adherence to the rule of law requires that Knox’s conviction be set aside as offending the constitutional provision against Double Jeopardy. Therefore, for the reasons offered, I respectfully dissent.
KING, C.J., AND ISHEE, J., JOIN THIS SEPARATE OPINION.

. While the majority opinion does not expressly state that the prosecution first became aware after the witness had begun his testimony that the witness was unrepresented by counsel, it implicitly makes such statement.

. The transcript lists the person throwing the bottle as "Willie James McGee.” However, there is no doubt that the person who threw the bottle, and who was later killed, was "Willie James McGill,” not "Willie James McGee.”

. It was obvious that even if Williams had counsel, his counsel was not present in the courtroom.