# United States Court of Appeals
## For the First Circuit

No. 03-2522

UNITED STATES OF AMERICA,

Appellee,

v.

DENNIS P. MCINTOSH,

Defendant, Appellant.

No. 03-2524

UNITED STATES OF AMERICA,

Appellee,

v.

HERBERT H. CATES,

Defendant, Appellant.

No. 03-2566

UNITED STATES OF AMERICA,

Appellee,

v.

JANICE DOUGLAS A/K/A JANICE BALTIMORE,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

---

Before

Boudin, Chief Judge,

Selya and Howard, Circuit Judges.

---

Willie J. Davis, with whom Davis, Robinson & White, LLP, James S. Dilday, and Grayer & Dilday were on consolidated brief, for appellants McIntosh and Douglas.
Peter Charles Horstmann, with whom Partridge, Ankner & Horstmann, LLP was on consolidated brief, for appellant Cates.
Peter A. Mullin, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for the United States.

---

August 20, 2004

---

**SELYA**, **Circuit Judge**. A federal grand jury charged defendants-appellants Dennis P. McIntosh, Janice Douglas, and Herbert H. Cates with multiple counts of mail and wire fraud. See 18 U.S.C. §§ 1342, 1343. After their first trial ended in a hung jury, the appellants moved to dismiss the indictment, asserting that further prosecution would run afoul of the Fifth Amendment's double jeopardy bar. The district court denied this joint motion and the appellants brought these interlocutory appeals. We affirm the denial of the motions to dismiss.[1]

## I. BACKGROUND

Given the nature of these appeals, we trace the case's procedural history with care. The appellants were indicted following what the government alleged was a fraudulent scheme to purchase over $3,000,000 worth of computer equipment using a university's discount with the intent to resell the merchandise at a profit. The case went to trial on July 28, 2003. The jury began its deliberations on August 11, 2003, at approximately 1:20 pm. At about 3:00 pm, the foreperson reported that Juror No. 1 had become ill. The district court thereupon excused the jury for the day.

That afternoon, several jurors reported to the deputy clerk that Juror No. 1 had been interrupting the deliberations by

---

[1]All three defendants pressed their appeals through briefing and oral argument. While this opinion was at the printer, Douglas voluntarily dismissed her appeal pursuant to a plea agreement. Thus, this opinion pertains only to the appeals prosecuted by McIntosh and Cates.

frequent trips to the bathroom.  To make matters worse, the jurors alleged that he had been speaking while there on his cell phone, in violation of courthouse policy.  The district court discussed the matter with counsel for the parties and decided to interview Juror No. 1 the next day.

Overnight, the clerk received a voicemail from a juror stating his belief that Juror No. 1 would be an impediment to future deliberations.  The juror added that Juror No. 1 "had a problem when we got back to the courtroom as well, stating that he feels that everybody is innocent and that nobody is going to change his mind. . . .  [W]hen we told him that we have to go through the steps and the process and everything . . . that's when he started feeling sick."

The next morning, the district court prudently played the voicemail for all counsel and proceeded to interview Juror No. 1 out of earshot of the remaining jurors.  The talesman admitted that he had his cell phone with him the previous day but denied using it.  When the court asked if he could deliberate in good faith, the juror responded "absolutely."

At the request of the Assistant United States Attorney (AUSA) and over defense counsels' objections, the district court also conducted individualized voir dire interviews of the foreperson and Juror No. 5.  Although both had seen Juror No. 1 with his cell phone, neither had actually seen him using it.  The

district court then brought all twelve jurors into the courtroom at 9:39 am, directed them to continue their deliberations, and sent them back to the jury room.

At 2:15 pm, the jury reported that it was deadlocked. After showing the note to counsel, the district court brought the jury into the courtroom and delivered a modified Allen charge. See Allen v. United States, 164 U.S. 492, 501 (1896); see also United States v. Keene, 287 F.3d 229, 235 (1st Cir. 2002).

Once the jury left to continue deliberations, the court stated that if it received another note indicating a continuing deadlock, it would not give a further Allen charge but, rather, would declare a mistrial. None of the lawyers for the several defendants voiced any objection to this proposed course of action. The foreperson sent a second such note at 3:10 pm, this time indicating that the jury had reached an impasse because one juror had made up his mind before deliberations began and would not budge. The district court again consulted with the attorneys. The prosecutor suggested interviewing the foreperson to determine whether the jury had actually been deliberating, but defense counsel unanimously objected to that proposal. Ultimately, the district court summoned the foreperson, who reported that the recalcitrant juror (whom she did not identify) had made up his mind and "will not deviate no matter what is presented before him."

Out of earshot of the foreperson, the district court asked the lawyers if they had further questions. Douglas's counsel responded, "I think you asked everything that need be asked." McIntosh's counsel concurred. The prosecutor pressed for an inquiry into whether the recalcitrant juror was refusing to talk about the evidence, but the district court rejected that entreaty. The court then instructed the foreperson to return to the jury room and determine whether the jurors were deadlocked on all counts.

At 4:05 pm, the jury sent a note asking to be excused for the day. This note also inquired whether the court would like to meet with the recalcitrant juror and stated that the other jurors felt the deliberations would end in a deadlock.

The district court decided to speak with the recalcitrant juror (who turned out to be Juror No. 1). On questioning by the court in the presence of all counsel, Juror No. 1 vouchsafed that he had not made up his mind before the case had been submitted to the jury. He also said that he and the other jurors had been debating the charges and going through the evidence. When specifically queried whether his opinion as to guilt or innocence was based on his "gut or on the evidence," he responded "[i]t's on my evidence." Upon concluding her interrogation, the district judge asked the attorneys if they had any further questions. There were no takers.

After Juror No. 1 left the room, Douglas's lawyer suggested that the district court declare a mistrial. The prosecutor opposed a mistrial and instead recommended that the court inquire further of the foreperson (a recommendation that the district court chose not to accept). Although tentatively concluding that the deliberations were at an impasse, the district court nonetheless instructed the jury to deliberate anew.

While the jury continued its deliberations, the district court conferred with the attorneys. The court specifically asked whether any defense counsel believed there would be a bar to retrial if the court were to declare a mistrial. None of them responded affirmatively.

The district court received a fourth jury note at approximately 4:45 pm. The jurors again reported that they were deadlocked. After the court told the parties of this billet-doux, the prosecutor informed the court that he had secured a criminal background check on Juror No. 1 and that the check showed that the juror had experienced fourteen arrests during the preceding ten years (all of which had been dismissed or continued without findings). One was very recent. The prosecutor contended that this pedigree raised questions about Juror No. 1's eligibility to serve, both because of his criminal history per se and because the information given during the jury qualification process was arguably false.

Following further discussions with counsel, the district court met again with Juror No. 1. The juror acknowledged his arrest history but reaffirmed that he had never been convicted of a felony. Consequently, he believed that he had answered the jury questionnaire truthfully. The court assured the juror — who displayed considerable pique that his criminal history had been investigated and disclosed — that it credited his good faith in answering the jury questionnaire and sent him back to the jury room.

At that point, the chambers conference resumed. The judge acknowledged that Juror No. 1's criminal history cast some doubt on his qualifications to serve and advised counsel that she would study the question overnight. She also stated that if she found Juror No. 1 qualified to serve, she would deem the jury hopelessly deadlocked and declare a mistrial.

On the next trial day (August 13), Douglas's lawyer filed a motion seeking both a mistrial and dismissal of the indictment. The motion papers asserted that the government's actions in performing a background check on a deliberating juror were both improper and designed to provoke a mistrial. At the beginning of that day's court session, the district court ruled that Juror No. 1 was not disqualified from serving on the jury. None of the defendants objected to this determination. The court then announced its intention to declare a mistrial because of the hung

-8-

jury. Douglas's lawyer asked for a ruling on his pending motion and the court denied it.

The district court and counsel then discussed the timing of a new trial. During this discussion, Douglas's attorney stated that he objected to the mistrial "for the other reasons on the record." This was presumably a reference to reasons apart from the allegation of prosecutorial misconduct. The district court responded that it did not "know what the other reasons" were, but the attorney chose not to elaborate. The court then reaffirmed its denial of Douglas's motion regarding the prosecutor's conduct and set a new trial date.

Before the district court returned the jury to the courtroom, Douglas's lawyer again objected to the mistrial without specifying the reasons for his objection. The district court's response indicated that it understood counsel to be renewing his earlier objection. Viewed in context, this understanding was reasonable. In all events, the lawyer did not advance any additional grounds for the objection. After the jury had been brought into the courtroom, the judge formally declared a mistrial.

On October 10, 2003, the defendants filed a joint motion to dismiss the indictment. The district court denied that motion five days later. These interlocutory appeals ensued. We have jurisdiction under an established exception to the final judgment rule, which allows criminal defendants presenting colorable claims

of double jeopardy to prosecute immediate appeals. <u>Abney</u> v. <u>United States</u>, 431 U.S. 651, 662 (1977); <u>United States</u> v. <u>Toribio-Lugo</u>, ___ F.3d ___, ___ (1st Cir. 2004) [No. 01-2565, slip op. at 5]; <u>Keene</u>, 287 F.3d at 232.

## II. ANALYSIS

A criminal defendant has a "valued right" to have his or her guilt or innocence determined by the jury to which the prosecution's case is first presented. <u>United States</u> v. <u>Jorn</u>, 400 U.S. 470, 484 (1971). This right is valued because of the onus of forcing a defendant to undergo multiple trials. In addition to the cost and potential public embarrassment that accompanies a trial, the fairness of the second trial may be compromised; having had a dress rehearsal, the government may adjust its case to impress the jury more favorably or to anticipate the defense. <u>Arizona</u> v. <u>Washington</u>, 434 U.S. 497, 503-04 (1978); <u>United States</u> v. <u>Julien</u>, 318 F.3d 316, 318 (1st Cir. 2003).

Because of these concerns, courts have construed the Double Jeopardy Clause[2] to bar retrial of a defendant after a mistrial ordered over the defendant's objection unless the mistrial was occasioned by manifest necessity. <u>United States</u> v. <u>Perez</u>, 22 U.S. (9 Wheat.) 579, 580 (1824); <u>Keene</u>, 287 F.3d at 234. It is the government's burden to show the existence of manifest necessity —

---

[2]The Clause ensures that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V.

-10-

and that burden is a heavy one.  Washington, 434 U.S. at 505.  In this context, a hung jury is the paradigmatic example of manifest necessity.  Julien, 318 F.3d at 319; Keene, 287 F.3d at 233.

We review the district court's determination of manifest necessity for abuse of discretion.  Washington, 434 U.S. at 514; United States v. Simonetti, 998 F.2d 39, 41 (1st Cir. 1993).  In this area of the law, however, we apply the abuse of discretion standard with added bite.  Toribio-Lugo, ___ F.3d at ___ [slip op. at 7]; Keene, 287 F.3d at 233.  Within the abuse of discretion rubric, questions of law engender plenary review while findings of fact are reviewed for clear error.  Toribio-Lugo, ___ F.3d at ___ [slip op. at 7].  An error of law, of course, is tantamount to an abuse of discretion.  Id.

In reviewing a district court's decision to declare a mistrial, we often have found it helpful to consider three factors: (1) whether the district court consulted with counsel; (2) whether the court considered alternatives to a mistrial; and (3) whether the court adequately reflected on the circumstances before making a decision.  See, e.g., Simonetti, 998 F.2d at 41.  We caution, however, that these factors serve only as a starting point.  Each case is sui generis and must be assessed on its idiosyncratic facts.  Keene, 287 F.3d at 234.

The lower court's conduct in this case comported fully with the Simonetti factors.  At every turn, the judge consulted

-11-

with the attorneys and solicited their recommendations on how to proceed. She explored other options and declared a mistrial only after concluding that those options were inutile. Finally, the judge's decision, made over the course of two days, was thoughtfully undertaken. In this situation, we will reverse only if the district court applied an incorrect legal principle or made a meaningful error in judgment.

The appellants suggest that three such bevues were committed. First, they posit that the district court erred in finding the jury deadlocked when, in actuality, the jury merely had failed to deliberate. Second, they argue that there was no manifest necessity to declare a mistrial because a lesser option had not been exhausted, that is, the court could have dismissed Juror No. 1 and permitted the deliberations to continue. See Fed. R. Crim. P. 23(b)(3) (allowing the trial judge in a criminal case to excuse a deliberating juror for good cause and permit a jury of eleven to return a verdict). Last, the appellants assert that even if aborting the trial was unavoidable, reprosecution should be foreclosed because the government's misconduct led to that result.

We start with a procedural point. The prophylaxis of the Double Jeopardy Clause constitutes a series of personal defenses that may be waived or foreclosed by a defendant's voluntary choices. Toribio-Lugo, ___ F.3d at ___ [slip op. at 11]. Thus, a defendant who requests a mistrial ordinarily is deemed to have

waived any subsequent claim of double jeopardy. See, e.g., United States v. Dinitz, 424 U.S. 600, 607 (1976); United States v. DiPietro, 936 F.2d 6, 9 (1st Cir. 1991). Consent to a mistrial has much the same effect. "[W]here the defendant sits silently by and does not object to the declaration of a mistrial even though he has a fair opportunity to do so," a court may presume his consent. Toribio-Lugo, ___ F.3d at ___ [slip op. at 11] (citing DiPietro, 936 F.2d at 9-11). In that event, any double jeopardy objection is by the boards.

In this instance, the appellants did not properly raise an objection to the declaration of a mistrial on either of the first two grounds that they urge here. The district court engaged in a continuous dialogue with counsel as the jury deliberations sputtered and stalled. Yet at no point before the court finally declared a mistrial and discharged the panel did the appellants register any objection either to a supposed lack of deliberation or to the court's unwillingness to jettison Juror No. 1.

These omissions are especially telling because the district court announced its intentions well in advance and, on the penultimate day of trial, defense counsel argued against the very propositions that they now seek to advance. Each time that the prosecutor asked the district court to inquire further into whether Juror No. 1 actually was engaging in deliberations, defense counsel objected. Similarly, defense counsel steadfastly resisted the

-13-

prosecutor's efforts to remove Juror No. 1 from the panel. Finally, defense counsel at one point implored the district court to declare a mistrial because the jury was deadlocked. It would be Kafkaesque — and wrong — for us to allow parties freely to advocate on appeal positions diametrically opposite to the positions taken by those parties in the trial court.

To be sure, the appellants did state at two other points that they objected to the declaration of a mistrial. But the context of those objections and the course of the proceedings over the previous two days adequately evince that the objections were based strictly and solely on the appellants' allegations of prosecutorial misconduct. There was nothing in the attorneys' comments that so much as hinted that they thought the jury was not hung or that they objected to the declaration of a mistrial because of the absence of a true deadlock. To cinch matters, counsels' statements on the day previous to the day of the mistrial gave every indication that they believed aborting the trial on that ground was the proper course. Accordingly, the district court had no occasion to consider the arguments that the appellants now belatedly seek to advance on appeal.

That is a matter of great importance. To preserve his or her double jeopardy rights, a criminal defendant must object to a mistrial at the time the mistrial is declared. DiPietro, 936 F.2d at 9-10. In so doing, the defendant must provide specific grounds

-14-

for the objection.  See United States v. Carrillo-Figueroa, 34 F.3d 33, 39 (1st Cir. 1994) ("Unless the basis for objection is apparent from the context, the grounds for objection must be specific so that the trial court may have an opportunity to address the claim . . . ."); cf. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("Judges are not expected to be mindreaders.  Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (citation and internal quotation marks omitted)).  Unless the context makes the lawyer's meaning reasonably clear, simply saying "objection" will not do.

To sum up, because the appellants gave no indication that they objected to a mistrial on either of the first two grounds asserted on appeal, we hold that they have forfeited those assignments of error.  Forfeited errors are, of course, ordinarily subject to review for plain error.  United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).  Here, however, we need not indulge in the niceties of plain error review since both of the grounds asserted are without merit and, thus, no error — plain or otherwise — inheres.

The first forfeited argument depends on the notion that a jury that fails to deliberate is unlike a deadlocked jury in the sense that a failure to deliberate does not constitute manifest necessity.  We perceive no difference in this distinction.

Regardless of whether it is deadlocked or fails to deliberate, a jury that is unable to reach a unanimous verdict is a hung jury. See Black's Law Dictionary 860 (7th ed. 1999) (defining "hung jury" as "[a] jury that cannot reach a verdict by the required voting margin").

Nor do we accept the appellants' suggestion that the district court abused its discretion by not requiring the jury to deliberate longer. There is no per se minimum period of deliberation that must expire before a mistrial may be declared on account of a hung jury. See Keene, 287 F.3d at 234. In this case, the jury had sent three notes confirming that it was deadlocked, and the judge had delivered a modified Allen charge. The record shows that the jury was becoming increasingly tense as the deliberations wore on. Under these circumstances, we cannot say that the district court acted unreasonably in pulling the plug.

This brings us to the second forfeited argument. In a nutshell, the appellants claim that the district court could have averted a mistrial altogether by dismissing Juror No. 1 and then proceeding with the eleven remaining jurors. Fed. R. Crim. P. 23(b)(3). This claim is unpersuasive. While the refusal on the part of an individual juror to engage in deliberations may in some circumstances constitute good cause for removing that juror, see, e.g., United States v. Baker, 262 F.3d 124, 132 (2d Cir. 2001), the court considered this argument at the government's behest and

determined that Juror No. 1 was not disqualified from service. Where, as here, the district court fully considers, but reasonably rejects, lesser alternatives to a mistrial, we will not second-guess its determination. See, e.g., United States v. Barbioni, 62 F.3d 5, 7 n.1 (1st Cir. 1995).

If more were needed — and we doubt that it is — we add that whether a juror is refusing to deliberate or has simply reached a conclusion contrary to the other jurors is a question of exquisite delicacy. The line between the two can be vanishingly thin. Because this determination requires close attention to the immediate circumstances, we accord great respect to the trial court's conclusion as to whether a juror is fulfilling his or her duty to deliberate. United States v. Barone, 114 F.3d 1284, 1307 (1st Cir. 1997).

Here, we find ample evidence in the record to support the district court's decision not to jettison Juror No. 1. The court twice inquired of the juror whether he was capable of fulfilling his duty to deliberate on the evidence; both times, he responded in the affirmative. When specifically asked whether he based his views about guilt or innocence on the evidence, the juror replied that he did. And, finally, the district court's reluctance to dismiss Juror No. 1 had a prudential dimension. By the time the question came into full focus, it was apparent that Juror No. 1 was

the lone holdout for acquittal.[3]  In the absence of unambiguous evidence that a juror is attempting to thwart the deliberative process, we believe the wisest course when a juror's views are known is to proceed cautiously.  See United States v. Brown, 823 F.2d 591, 597 (D.C. Cir. 1987) (holding that a court may not dismiss a juror "when the record evidence discloses a possibility that the juror believes that the government has failed to present sufficient evidence to support a conviction").

In a related vein, the appellants would have us hold that the district court failed to conduct an adequate inquiry into Juror No. 1's actions.  That argument is hopeless.  As we have said, "in light of the infinite variety of situations in which juror misconduct might be discerned and the need to protect jurors and the jury process from undue imposition, the trial judge is vested with the discretion to fashion an appropriate and responsible procedure to determine whether misconduct actually occurred and whether it was prejudicial."  United States v. Ortiz-Arrigoitia, 996 F.2d 436, 443 (1st Cir. 1993).  That observation is especially pertinent here because the district court knew that Juror No. 1 was the lone holdout for acquittal.  See United States v. Thomas, 116 F.3d 606, 620 (2d Cir. 1997) ("Were a district judge permitted to

_____

[3]We cannot pass over the fact that the appellants' argument in effect asks us to hold that the district court erred by not dismissing the lone holdout for acquittal.  This proves once again that "irony is no stranger to the law."  Amanullah v. Nelson, 811 F.2d 1, 18 (1st Cir. 1987).

-18-

conduct intrusive inquiries into — and make extensive findings of fact concerning — the reasoning behind a juror's view of the case, . . . this would not only seriously breach the principle of the secrecy of jury deliberations, but it would invite trial judges to second-guess and influence the work of the jury."). The district court acted well within its discretion in declining to probe further into Juror No. 1's views.

That disposes of the appellants' first two arguments, but leaves open the last: their contention that the mistrial was provoked by the prosecutor's misconduct. That contention lacks force.

It is settled law that the Double Jeopardy Clause provides a defendant with a shield against prosecutorial maneuvering designed to provoke a mistrial. Oregon v. Kennedy, 456 U.S. 667, 674 (1982); Dinitz, 424 U.S. at 611. Consequently, if the prosecutor purposefully instigated a mistrial or if he committed misconduct designed to bring one about, the Double Jeopardy Clause may be invoked as a bar to further prosecution notwithstanding the defendants' consent (or failure to object) to the mistrial. See Creighton v. Hall, 310 F.3d 221, 227 (1st Cir. 2002).

The appellants contend that the AUSA ran a criminal background check on Juror No. 1; that this improper action caused the juror to dig in his heels and obviated any hope of breaking the

-19-

jury deadlock; and that, therefore, the government must bear responsibility for the ensuing mistrial. This contention is meritless: prosecutorial error or even prosecutorial harassment that results in a mistrial will not unlatch the double jeopardy bar in the absence of the intent to cause a mistrial. Id.

In this case, it is transparently clear that the AUSA had no such intention. Throughout the colloquy between the district court and counsel, the AUSA consistently opposed declaring a mistrial. Instead, he repeatedly urged the court either to inquire further regarding Juror No. 1's participation in the deliberations or to give the jury more time to dissolve the impasse. Only when the trial judge made it plain that she was determined to declare a mistrial did the prosecutor inform the judge of the criminal record check. Far from attempting to provoke a mistrial, it is readily evident that the prosecutor labored to salvage the proceeding by presenting possible grounds for the disqualification of Juror No. 1.

The appellants suggest that the AUSA's actions ought to preclude retrial because the investigation of Juror No. 1 violated Massachusetts Disciplinary Rule 7-109(E).[4] Appellant's Br. at 28. This suggestion is quadruply flawed.

---

[4]The Massachusetts Rules of Professional Conduct are made applicable to attorneys practicing in the United States District Court for the District of Massachusetts by Local Rule 83.6(4)(B).

First, Massachusetts Disciplinary Rule 7-109(E), which formerly prohibited a lawyer from undertaking "a vexatious or harassing investigation of . . . a juror," was superseded over five years before the conduct at issue here. The current Massachusetts Rules of Professional Conduct contain no comparable provision. Second, we see no impropriety in the AUSA's actions. Third, even if the AUSA had violated an ethical rule, such an infraction, in and of itself, would not necessarily demonstrate an intent to provoke a mistrial. Fourth, the record, fairly viewed, eliminates the possibility of any causal link between the background check and the mistrial.

We briefly explain this last point. The obtaining of the background check could not have harassed the juror because the check was invisible. Until the AUSA presented his findings to the district court, no one — including the juror — knew that the check had been performed. Moreover, the AUSA never confronted the juror with the results of the background check; instead, he presented the information to the court for the entirely proper purpose of determining Juror No. 1's eligibility to serve. Even this measured step was not taken until it became pellucid that, unless Juror No. 1 was disqualified, the district court would declare a mistrial. Under the circumstances, the AUSA's conduct could not have had a causative effect on the occurrence of the mistrial.

## III.  CONCLUSION

We need go no further.  Because the district court did not abuse its discretion in finding manifest necessity to declare a mistrial and because the government did not engage in any mistrial-provoking misconduct, principles of double jeopardy do not bar the government from retrying the appellants.

**<u>Affirmed</u>**.