# United States Court of Appeals
## For the First Circuit

No. 06-2108

UNITED STATES OF AMERICA,

Appellee,

v.

PAULINO LARA-RAMIREZ,

Defendant, Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Héctor M. Laffitte, U.S. District Judge]

Before

Lipez and Howard, Circuit Judges,
and Smith,[*] District Judge.

Jacabed Rodriguez-Coss, with whom Rosa Emilia Rodriguez-Velez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, were on brief, for appellee.
Juan J. Hernández López de Victoria for appellant.

March 11, 2008

[*]Of the District of Rhode Island, sitting by designation.

**LIPEZ, <u>Circuit Judge</u>.** Defendant Paulino Lara-Ramirez ("Lara") appeals the denial of a motion to dismiss the charges against him on double jeopardy grounds after his first trial resulted in a mistrial. He argues that the district court's mistrial declaration, following discovery of a Bible in the jury room during deliberations, was made without his consent and without the required showing of manifest necessity. After careful review, we agree and conclude that the district court erred in refusing to dismiss the indictment.

**I.**

Lara was indicted for importing and distributing more than 500 grams of cocaine in violation of 21 U.S.C. §§ 841(a) and 952(a). On the third day of his trial, the jury was instructed and retired to deliberate. Shortly thereafter, the court received a note from the jury requesting, inter alia, a transcript of Lara's testimony. In response, the court sent the court reporter into the jury room to read the testimony aloud. Later that day, the court received a second note[1] from the jury that read:

> Your Honor,
>         We need to inform you that we can't reach a unanimously veredict. We can't get an agreement. We had performed several rounds of votings.
>         The jury had revised all evidence but is still divided in the decision of guilty or not guilty. Is divided evenly.

---

[1]The jury note and all quotes from the trial transcript are reproduced herein verbatim with typographical errors retained.

At that point, the court convened a conference with counsel. It read the note to the attorneys and also informed them that the court reporter had reported seeing a Bible in the jury room while she was reading the transcript.[2] The court stated:

> It seems to me that I just read a case, I'm not certain where I read it, it was ordered a new trial when the jurors had a Bible in the jury room, because then they're violating the instructions of the Court that they should not consider anything but the evidence.

Then the court reporter stated for the record that she "saw a huge Bible, not the kind you carry in your pocket like a daily inspiration." Engaging counsel in a discussion of what should be done, the court initially proposed that it could "give them an Allen charge, and also tell them that they're not supposed to have a Bible in the jury room."[3] The prosecutor agreed that an Allen charge should be given. However, the court retreated from its initial proposal, stating that "[i]f they have that Bible . . . that would contaminate the whole thing."

The prosecutor tried to alleviate the court's concern, suggesting that "if a juror simply has the habit of carrying a

---

[2]The record does not disclose when the court reporter told the judge that she had seen a Bible in the jury room. In any event, the parties do not complain about any delay between the court reporter's observation and the judge's convening of a conference with counsel to relay that information and formulate a response.

[3]See Allen v. United States, 164 U.S. 492, 501-02 (1896) (upholding the practice of using a supplemental jury instruction to help a deadlocked jury reach unanimity).

-3-

Bible around with him or her . . . . In that case, it would not be considered a contamination." The court resisted, however, responding: "It's in the jury room." The prosecutor urged the court not to assume that the Bible's presence was a problem without evidence that it had been used in the jury's deliberations. The court then suggested a voir dire of the jury foreperson to "ask whether the Bible has been used in their deliberations[.]" The prosecutor and defense counsel both agreed to that course of action.

In the presence of counsel, the court called the jury foreperson into the conference room and asked her about the Bible. The brief questioning established that a juror had brought a Bible into the jury room and that the same juror had "used the Bible in deliberations." The court then asked the foreperson, "Would you say that [the juror's] position, whatever it is – don't tell me whether she's for or against – is based on the Bible, if you know?" The foreperson replied, "Well, his evidence are based, based – he wants the rest of us to – yes, we hear the facts, but also consider what God says in the Bible, something like that." The government requested the juror number for the juror who had brought the Bible. The court refused this request, stating, "No. I don't want to know who it is." The court then asked counsel whether they wanted him to ask any other questions of the foreperson. Both replied in the negative and the foreperson left the room.

The court asked to hear from counsel. Both the prosecutor and defense counsel began by stating that they were not familiar with case law regarding the presence of a Bible in the jury room. The prosecutor requested a mistrial, characterizing the foreperson's testimony as "essentially stat[ing] that [the juror who brought the Bible] has referred to specific portions of the Bible and has urged the remaining members of that jury to consider those portions of the Bible in their deliberations." This characterization greatly overstated the foreperson's account of the juror's Bible reference. The jury foreperson did not state that the juror had referred to specific portions of the Bible. Nor did the jury foreperson describe this juror as urging the other members of the jury to consider any specific portions of the Bible in their deliberations. Nonetheless, the court agreed with the prosecutor's characterization of the foreperson's testimony[4] and asked defense counsel for suggestions about how to proceed. Defense counsel offered two options – individual interviews with each of the jurors and a curative instruction – each of which was quickly rejected by the court in the following exchange:

> DEFENSE COUNSEL: You can instruct them that they should disregard any elements --

---

[4]Immediately following the prosecutor's characterization of the foreperson's testimony, the court stated: "And that violates the court's instruction, and it seems to inject a matter that is irrelevant, although holy, but irrelevant to the issue."

> COURT: That's already done. The cat is out of the bag. We can't now say to this juror, don't use any Biblical arguments.
> DEFENSE COUNSEL: Maybe we can interview them one by one and say --
> COURT: No, no.
> DEFENSE COUNSEL: Maybe they'll be able to do it, to disregard --
> COURT: I'm inclined to go along with the Government, to declare a mistrial, because I don't think that this is going to get any better, and to me, it's useless to give an Allen charge.
> DEFENSE COUNSEL: Maybe interview them one by one.
> COURT: No, counsel. That will be interjecting the Court into the deliberation process of the jurors.
> . . .
> COURT: Counsel, give me any other suggestion other than asking jurors one by one why I shouldn't declare a mistrial.
> DEFENSE COUNSEL: My only suggestion, Your Honor, would be either instructing them that they should disregard anything that has been discussed or commented as to the Bible, and ask them whether they would be able to do so, as opposed to – that you are supposed to follow the law.

The court once again rejected this course of action, noting that the jurors were not yet aware that the court knew about the Bible in the jury room. Defense counsel suggested that they could be made aware and that a curative instruction could be given. The court replied that curative instructions could not be used after the jury had begun to deliberate:

> COURT: This is not an issue where you can give a curative instruction at trial where something is said, something out of bounds, and the jury has not been deliberating and you tell the jury, don't do this, don't do that. Of course, they wouldn't do it. But now it's

-6-

done. There's nothing that I can do to cure that, because the purpose of a curative instruction is given to the jury before they go to deliberate so that they can disregard that offhand remark that the Court has told them not to consider. But here, they did already discuss the Bible, and injected the Bible into the deliberations. They have a Bible there. Next time, I'll make sure that there's no Bible, nor any other book that – this thing is really serious, because you are injecting religion, we're injecting religion. It's not, well, they're reading the papers, the World Series, they're reading about what happened in Iraq. That can be cured by saying, give me back the paper. But here, I can't take back what has already been done. Like in Macbeth, what is done cannot be undone. Shakespeare. Unless you come up with any better solution, I don't see any.
DEFENSE COUNSEL: The only one is the one I have stated, Your Honor, to ask them one by one whether they can still not consider any argument without giving consideration to the Bible.
COURT: That will be worse. The remedy would be worse than the cure.

The court then concluded that it had "no choice" but to declare a mistrial. The court recalled the jury into the courtroom and dismissed them. A new trial date was set for January 18, 2006.[5]

On January 12, 2006, Lara moved to dismiss the indictment on the basis of double jeopardy, arguing that the court had not adequately considered alternatives to a mistrial during his first trial. The court denied the motion in a written opinion on February 24, 2006, explaining: "In the instant case, the declaration of a mistrial was a manifest necessity: first, the jury

[5]The second trial actually commenced on February 27, 2006.

had informed that it was deadlocked; second, the jury foreperson indicated that the jury had been using the Bible during deliberations." Noting the discretion afforded trial judges in responding to unexpected events at trial, the court recounted that it had "maintained open communication with both counsel, requested their suggestions to avoid a mistrial, investigated the situation as to the presence of a Bible in the jury room with the presence of counsel, and heard and carefully considered counsel's arguments." The court rejected the claim of the defendant that it had made a "precipitate decision, reflected by a rapid sequence of events culminating in a declaration of mistrial." Instead, the court stated that its decision to declare a mistrial was "a pondered assessment of many factors, careful not to intrude upon the sanctity of the jury's deliberation or to place upon the jury even the subtlest of pressures." The court then repeated its "manifest necessity" evaluation:

> Where, as here, the jury's initiative to communicate to the judge that it is deadlocked is coupled with the presence and use of a Bible in the jury room and during deliberations, having heard counsel and carefully considered and reflected upon the alternatives, it stands to reason that the Court's "declaration of a mistrial was reasonably necessary under all the circumstances." [United States v.] Brown, [426 F.3d 32, 37 (1st Cir. 2005) (quoting United States v. Keene, 287 F.3d 229, 234 (1st Cir. 2002)].

-8-

The court then concluded: "In view of all the circumstances, cautioning the jurors as to their ability to render a verdict discarding any reference to the Bible would have been self-defeating and an ensuing <u>Allen</u> charge would have been rendered unsuccessful."

Following a second jury trial, Lara was convicted and sentenced to 60 months in prison.[6] He then filed this timely appeal, arguing that the second trial violated his constitutional right to avoid double jeopardy.

## II.

The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from being "twice put in jeopardy" for the same offense. U.S. Const. amend. V. A defendant's "valued right to have his trial completed by a particular tribunal," <u>United States</u> v. <u>Jorn</u>, 400 U.S. 470, 484-85 (1971) (plurality opinion) (quoting <u>Wade</u> v. <u>Hunter</u>, 336 U.S. 684, 689 (1949)), is a constitutional protection "entitled to the deepest respect." <u>United States</u> v. <u>Pierce</u>, 593 F.2d 415, 419 (1st Cir. 1979). As a result, the declaration of a mistrial must be a last resort, implemented only if the jury's ability to reach a just verdict has been incurably compromised. <u>United States</u> v. <u>Diaz</u>, 494 F.3d 221, 227 (1st Cir. 2007) ("'Declaring a mistrial is a last resort, only

---

[6]The jury in Lara's second trial also sent the court a note indicating that it was deadlocked. The court responded by giving an <u>Allen</u> charge, and the jury returned a verdict a few hours later.

to be implemented if the taint is ineradicable, that is, only if the trial judge believes that the jury's exposure to the evidence is likely to prove beyond realistic hope of repair.'" (quoting United States v. Sepulveda, 15 F.3d 1161, 1184 (1st Cir. 1993))). A defendant may waive his right to avoid double jeopardy by consenting to a mistrial; ordinarily, the prosecution may then proceed with a new trial. United States v. Toribio-Lugo, 376 F.3d 33, 38 (1st Cir. 2004). However, when a mistrial is declared without the defendant's consent, the permissibility of a new trial depends upon the "manifest necessity" for the mistrial declaration. United States v. DiPietro, 936 F.2d 6, 9 (1st Cir. 1991).

We review the denial of a motion to dismiss on double jeopardy grounds following the declaration of a mistrial for abuse of discretion. Toribio-Lugo, 376 F.3d at 38. Mindful of the important constitutional right involved, our "appellate review must ensure that the trial court indulged in a 'scrupulous exercise of judicial discretion'" in its decision to declare a mistrial. Id. (quoting Jorn, 400 U.S. at 485). To that end, we accept the trial court's factual findings unless they are clearly erroneous, but "review the legal principles on which the court premised its decision" de novo, United States v. Bradshaw, 281 F.3d 278, 291 (1st Cir. 2002), cognizant that a "mistake of law is, a fortiori, an abuse of discretion," Toribio-Lugo, 376 F.3d at 38. We then "ask whether, given the totality of the circumstances then and

there obtaining, the sum of the trial court's acts and omissions constituted a misuse of its discretion."  Bradshaw, 281 F.3d at 291.

## A. Consent

The district court applied the "manifest necessity" test in its order denying Lara's motion to dismiss, thus implicitly concluding that Lara had not consented to the mistrial.  We review this implicit legal determination de novo.  Toribio-Lugo, 376 F.3d at 38 ("Whether the facts as found add up to consent is a legal determination that we review de novo.").

The government argues that Lara failed to clearly object to the granting of a mistrial, and thereby "conceded to the declaration of the mistrial and cannot now raise a violation of his rights under the Double Jeopardy Clause."  To evaluate this claim, we must inquire whether Lara waived his right to avoid double jeopardy by consenting, either expressly or impliedly, to the mistrial.  Id.; DiPietro, 936 F.2d at 9; see also United States v. Smith, 621 F.2d 350, 351-52 (9th Cir. 1980).  Consent may sometimes "be implied from a defendant's acts or failures to act, such as where the defendant sits silently by and does not object to the declaration of a mistrial even though he has a fair opportunity to do so."  Toribio-Lugo, 376 F.3d at 40.  However, such an "implication of consent is not lightly to be indulged."  Id.

-11-

Here, the actions of defense counsel belied any suggestion of consent. He repeatedly urged specific alternatives to the mistrial, thereby giving unmistakable notice to the trial court that he opposed a mistrial declaration. While our prior holdings make clear that, in the usual case, counsel must formalize his or her lack of consent with an on the record objection setting forth reasons for the objection, it is immaterial here that defense counsel did not say the words "I object" in the immediate aftermath of the court's declaration of a mistrial. The record makes clear that counsel intended and the district court understood that Lara objected to and did not consent to the mistrial. Moreover, the court understood the reasons for the objection. That is why the district court never even discussed the issue of consent in its written decision denying the motion to dismiss the indictment.

Our decision in DiPietro, cited by the government, is not to the contrary. See 936 F.2d at 11. There we held that, although the court had not explicitly alerted counsel that it was considering a mistrial, defense counsel "'should have anticipated the possibility of a mistrial and been prepared to object or suggest more acceptable alternatives when the trial judge announced his ruling.'" Id. (quoting Camden v. Circuit Court, 892 F.2d 610, 618 (7th Cir. 1989)) (emphasis added). In DiPietro, defense counsel never offered any alternatives to a mistrial. Id. Although the government's counsel and the judge remained in the

-12-

courtroom for several minutes following the mistrial declaration, defense counsel said nothing at all about the mistrial issue. Id. Instead, she consulted her calendar and discussed acceptable dates for a new trial. Id. Thus, we concluded that "[g]iven no hint that the defendant desired her fate to be entrusted to this particular, and perhaps severely prejudiced jury, the court did not have to consider any such undisclosed wishes." Id. Here, unlike in DiPietro, Lara's counsel urged the court to consider alternatives to a mistrial, provided explicit suggestions, and never acquiesced in the court's conclusion that it had "no choice" but to declare a mistrial. These persistent pleas to pursue a different course of action preclude any implication of consent. To the contrary, counsel's suggestions informed the court that Lara desired his fate to be determined by this particular jury.

Our decision in United States v. McIntosh, 380 F.3d 548, 555 (1st Cir. 2004), also cited by the government, is similarly distinguishable from the facts here. There we held that the defendants had forfeited two of their three grounds for appeal by failing to explicitly object on those grounds at the time the mistrial was declared. Id. After a series of problems with a particular juror, repeated reports of deadlock, and a series of attempted remedies, defense counsel had moved for a mistrial and a dismissal of the indictment on the ground of prosecutorial

misconduct.[7]  Id. at 552.  However, the trial court declared a mistrial based on a finding of intractable deadlock and then denied the prosecutorial misconduct motion.  Id.  Although defense counsel objected generally to the mistrial declaration, we explained that "[t]here was nothing in the attorneys' comments that so much as hinted that they thought the jury was not hung or that they objected to the declaration of a mistrial because of the absence of a true deadlock."  Id. at 555.  In fact, we noted that "counsels' statements on the day previous to the day of the mistrial gave every indication that they believed aborting the trial on that ground was the proper course."  Id.  As a result of the failure to explain the grounds for their objection, we concluded that "the district court had no occasion to consider the arguments that the appellants now belatedly seek to advance on appeal."  Id.  In contrast, Lara's counsel explicitly disagreed with the court's assessment of the magnitude of the taint caused by the Bible's presence in the jury room and urged alternatives to the declaration of a mistrial.  The trial court here had every opportunity to consider Lara's position prior to rendering its decision.

---

[7]The Double Jeopardy Clause shields defendants against prosecutorial maneuvering designed to provoke a mistrial. United States v. McIntosh, 380 F.3d 548, 557 (1st Cir. 2004).  As such, the defendants in McIntosh wished to show that the mistrial had not been rendered "manifestly necessary" by the deadlock, but rather had been provoked by the prosecutor's misconduct.  Id.

In light of all the circumstances, we find no evidence that Lara impliedly consented to the mistrial. As a result, we agree with the district court's conclusion that the "manifest necessity" test applies.

**B. Manifest Necessity**

The inquiry into whether a mistrial was justified by "manifest necessity" is "case-specific" and "cannot be discharged by resort to a mechanical checklist." Brown, 426 F.3d at 36. Our task on appeal is to determine "whether the district judge's declaration of a mistrial was reasonably necessary under all the circumstances." Id. at 37 (quoting Keene, 287 F.3d at 234). We are guided in this determination by consideration of three interrelated factors: "(i) whether alternatives to a mistrial were explored and exhausted; (ii) whether counsel had an opportunity to be heard; and (iii) whether the judge's decision was made after sufficient reflection." Toribio-Lugo, 376 F.3d at 39; see also United States v. Simonetti, 998 F.2d 39, 41 (1st Cir. 1993).

1. Reported Deadlock

When the court declared a mistrial, it did not treat the reported deadlock as an important factor in its mistrial decision. Near the beginning of the colloquy, the court stated, "[i]f the Bible has played nothing in the jury deliberations, we can then move to an Allen charge." However, after questioning the jury foreperson, the court concluded that the Bible had played a role in

-15-

deliberations and that, as a result, "it [was] useless to give an Allen charge," which would have urged jurors to reexamine their positions and listen to the views of their fellow jurors. In the court's view, it was pointless to ask the jurors to reexamine their positions when those positions had been incurably tainted by the presence of the Bible in the jury room.

As we explain more fully below, the premise of the court's refusal to consider an Allen charge further – the ineradicable taint of the Bible – was seriously flawed. The court had assumed an ineradicable taint without pursuing the alternatives, suggested by defense counsel, that might have disproved any such taint or suggested the appropriateness of a curative instruction.

In its subsequent written decision denying Lara's motion to dismiss, the court treated the deadlock issue somewhat differently. There, the court concluded that the combination of the reported deadlock and the Bible issues created a manifest necessity for a mistrial.[8] However, if the court was going to give some independent weight to the jury's report of a deadlock (which it did not do when it declared the mistrial), it had to at least

---

[8]The jury had voluntarily divulged in its note that it was "divided evenly." However, the voluntary disclosure of such information by a jury does not necessitate a mistrial. United States v. Hotz, 620 F.2d 5, 7 (1st Cir. 1980) (holding that a mistrial declaration was not manifestly necessary where the jury reported an 11-1 deadlock after four hours of deliberation).

explore the alternatives that might have remedied the deadlock or determined its intractable nature. It never did that because of its flawed premise that the Bible taint made it pointless to address the deadlock issue. As a result, the record is insufficient to give any weight to the jury deadlock in the manifest necessity analysis. See United States v. Razmilovic, 507 F.3d 130, 140 (2d Cir. 2007) ("[W]here the record does not indicate that there was a genuine deadlock, and the court has not provided an explanation for its conclusion or pointed to factors that might not be adequately reflected on a cold record, we are unable to satisfy ourselves that the trial judge exercised 'sound discretion' in declaring a mistrial.") Accordingly, the correctness of the court's manifest necessity determination turns on the necessity of the court's mistrial declaration as a response to the presence of a Bible in the jury room during deliberations.

　　　　2.　Bible in the Jury Room

　　　　Our task then is to determine whether the district court adequately explored and exhausted alternatives to a mistrial on the basis of the Bible in the jury room and whether the court declared the mistrial after sufficient reflection.[9] "[When] a colorable claim of jury taint surfaces during jury deliberations, the trial

---

[9]The court gave counsel an opportunity to be heard prior to the mistrial declaration. As a result, the second prong of the manifest necessity test, see Toribio-Lugo, 376 F.3d at 39, is not at issue in this case.

-17-

court has a duty to investigate the allegation promptly." Bradshaw, 281 F.3d at 289 (footnote omitted); see also United States v. Corbin, 590 F.2d 398, 400 (1st Cir. 1979). The investigation must "ascertain whether some taint-producing event actually occurred," and then "assess the magnitude of the event and the extent of any resultant prejudice." Bradshaw, 281 F.3d at 289. Even if both a taint-producing event and a significant potential for prejudice are found through the investigation, a mistrial is still a remedy of last resort. See id. The court must first consider "the extent to which prophylactic measures (such as the discharge of particular jurors or the pronouncement of curative instructions) will suffice to alleviate prejudice." Id. This painstaking investigatory process protects the defendant's constitutional right to an unbiased jury, id. at 289-90, as well as his "'valued right to have his trial completed by a particular tribunal,'" Jorn, 400 U.S. at 484 (plurality opinion) (quoting Wade, 336 U.S. at 689). The investigation is also critical in creating a sufficient record to permit meaningful appellate review of the district court's manifest necessity determination.

Although we recognize that the presence of the Bible in the jury room posed an unusual situation for the district court, we must conclude that the inquiry conducted by the court was inadequate to support a finding that a mistrial was manifestly necessary. The court questioned only the court reporter and the

-18-

jury foreperson. This minimal investigation produced only the following evidence: that a Bible had been brought into the jury room by one of the jurors, and that the same juror had stated, during deliberations, that he wanted the other jurors to "hear the facts, but also consider what God says in the Bible, something like that." Immediately following the court's questioning of the jury foreperson (after the foreperson had been excused), the prosecutor characterized the foreperson's testimony as revealing that the juror who brought the Bible had "referred to specific portions in the Bible and [had] urged the remaining members of that jury to consider those portions of the Bible in their deliberations." As we noted earlier, this characterization of the foreperson's testimony is untenable. We do not know whether any specific portions of the Bible were actually read or referred to or whether the Bible was ever even opened. We do not know whether the Bible was discussed by jurors during deliberations or whether a single juror simply referred to the Bible generally as something that should be taken into account. In sum, although the questioning of the jury foreperson may have been enough to establish that a "taint-producing event" had occurred, it fell far short of establishing the magnitude of the "taint-producing event" and the "extent of any resultant prejudice." Without this information, the court had no basis upon which to assess the potential efficacy of

the alternatives to a mistrial, such as further questioning of individual jurors, a curative instruction, or both.

We recognize that conducting an inquiry into a colorable question of jury taint, particularly when that taint involves the Bible, is a delicate matter. See Bradshaw, 281 F.3d at 290. The privacy and secrecy of jury deliberations play an important role in isolating the jury from undue influence. United States v. Olano, 507 U.S. 725, 737-38 (1993). However, concern for the sanctity of jury deliberations may not be elevated above the defendant's right to have his fate decided by the first jury empaneled in his case. Although the district court has broad discretion to "fashion an appropriate procedure for assessing whether the jury has been exposed to substantively damaging information, and if so, whether cognizable prejudice is an inevitable and ineradicable concomitant" of the jury's exposure to an improper outside influence, Bradshaw, 281 F.3d at 290, the judge does not have discretion to refuse to conduct any inquiry at all regarding the magnitude of the taint-producing event and the extent of the resulting prejudice. Accordingly, the district court's investigation in this case fell short of the "scrupulous exercise of judicial discretion" required to support the mistrial declaration. See Jorn, 400 U.S. at 485 (plurality opinion).

Additionally, we discern two misconceptions of the law that appear to have contributed to the overly hasty mistrial

declaration in this case. First, the district court indicated that curative instructions may only be "given to the jury before they go to deliberate." Our case law does not support such a restrictive view of curative instructions. Although the issue does not arise often, see Bradshaw, 281 F.3d at 289 n.6 (noting that the vast majority of reported cases deal with claims of jury taint raised after the jury has returned a verdict), we have held that curative instructions are an appropriate remedy when jurors are exposed, during their deliberations, to extraneous materials. Id. at 291-92.

In Bradshaw, an unredacted copy of an indictment charging the defendant with three serious criminal counts that were not before the jury was found in the jury room and discussed by the jurors. 281 F.3d at 282, 290. When informed of the incident, the court first conducted an individual voir dire of each juror to determine precisely what had occurred and assess the magnitude of its impact on the jury's deliberations. Id. at 290. Then, the court gave a "strongly-worded curative instruction." Id. at 291. Finally, the court undertook a second round of individual voir dire examinations, inquiring into each juror's ability to "'put out of [his or her] mind[] entirely the facts and circumstances of the extraneous document' so he or she might decide the case solely on the evidence introduced at trial." Id. During its questioning, the court probed "the extent of the jurors' exposure to the

extraneous information and its potential impact on their ability to render an impartial verdict." Id. at 291-92. This careful investigatory process, coupled with the curative instruction, allowed the court to make "explicit findings that [were] amply rooted" in the record and fully supported its decision to allow the empaneled jury to proceed to a verdict. Id. at 292.

The procedure followed by the trial court in Bradshaw was precisely the course of action repeatedly advocated by Lara's counsel during the colloquy prior to the mistrial declaration in this case. The court rebuffed these suggestions by stating that "[t]he cat is out of the bag" and that "what is done cannot be undone." In its written opinion denying Lara's motion to dismiss, the court stated that, "[i]n view of all the circumstances, cautioning the jurors as to their ability to render a verdict discarding any reference to the Bible would have been self-defeating."

We do not understand the basis for these generalities. Although a more developed record might have supported findings that the Bible had played a central role in deliberations and that individual jurors would not have been able to disregard its influence, we see no basis for such findings in this record. See Razmilovic, 507 F.3d at 139 (finding mistrial declaration to be an abuse of discretion when "nothing in the record . . . suggest[ed] why the use of any of [the alternatives to mistrial suggested by

-22-

the defendant] would have created a risk that the jury would reach a verdict that would not reflect its 'considered judgment'" (quoting Washington, 434 U.S. at 509)). We cannot assume, as the district court apparently did, that individual voir dire of the jurors and a curative instruction would not have eradicated the risk of prejudice in this case. See Toribio-Lugo, 376 F.3d at 39 ("Where there is a viable alternative to a mistrial and the district court fails adequately to explore it, a finding of manifest necessity cannot stand.").

As a second legal misconception, the court treated the Bible in the jury room as qualitatively different from other types of extraneous materials or information that may taint a jury's deliberations.[10] At times in the colloquy with counsel, the court appeared to invoke a per se rule that the presence of the Bible in the jury room, combined with the mention of it by a juror during deliberations, produces a taint so egregious that it cannot be cured.[11]

---

[10]The government argues that, by failing to raise the issue below, Lara has waived his claim that the court committed legal error by invoking a per se rule that a mistrial is required when a Bible is present in the jury room. We need not consider this waiver argument because our discussion of the court's attitude toward the Bible in the jury room is not an independent basis for our decision. Rather, as we see it, the court's per se approach was just one factor that contributed to the precipitous decision to declare a mistrial in this case.

[11]At the beginning of its colloquy with counsel, the judge said, "It seems to me that I just read a case, I'm not certain where I read it, it was ordered a new trial when the jurors had a

-23-

No such per se rule exists in this – or any other – circuit. We have never decided a case involving a Bible in a jury room, nor has the Supreme Court. Moreover, our sister circuits have addressed the prejudice arising from a Bible in a jury room only in habeas cases where the jury's discussion of the Bible was discovered after the jury had returned a verdict. See, e.g., Fields v. Brown, 503 F.3d 755, 781-82 (9th Cir. 2007) (en banc) (denying habeas relief where jury considered, during the penalty phase of a capital case, Biblical references that exposited general, well-known themes that cut both in favor of and against imposition of the death penalty); Robinson v. Polk, 438 F.3d 350, 366 (4th Cir. 2006) (holding that state postconviction court did not act unreasonably in determining that jury's reading of Bible passages during sentencing deliberations in a capital case did not violate petitioner's Sixth Amendment rights); McNair v. Campbell, 416 F.3d 1291, 1308 (11th Cir. 2005) (denying habeas relief where state court supportably found that two Bible passages were read

Bible in the jury room, because then they're violating the instructions of the Court that they should not consider anything but the evidence." Just before questioning the jury foreperson, the judge remarked, "If this is happening, then we probably have no other choice than to declare a mistrial if they've been using the Bible." In response to defense counsel's first suggestion that the court give a curative instruction, the judge replied, "That's already done. The cat is out of the bag. We can't now say to this juror, don't use any Biblical arguments." These statements, taken together, indicate that the judge perceived a per se rule requiring a mistrial when a juror makes reference to the Bible during deliberations.

during jury deliberations and that "[n]either of these scriptures contain material which would encourage jurors to find a defendant guilty or to recommend the death penalty"). These cases, which arise in an entirely different procedural context, are of limited utility here.

Nonetheless, against this legal backdrop, the district court attached undue significance to the presence of the Bible in the jury room. See United States v. Frabizio, 459 F.3d 80, 91 (1st Cir. 2006) ("[A]n abuse of discretion occurs when a relevant factor deserving of significant weight is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales."). None of the cases from our sister circuits even hint at a per se rule that juror discussion of the Bible in the jury room during deliberations creates an incurable taint that forecloses any possibility of curative instruction and requires a mistrial. Because no special rule exists when the Bible is involved, the district court had a duty to investigate the "colorable claim of juror taint" in this case and explore and exhaust the alternatives to mistrial, just as it would in other situations where extraneous materials have been brought into the jury's deliberations. See Bradshaw, 281 F.3d at 289-90; Corbin, 590 F.2d at 400. The investigation it conducted

-25-

fell far short of that requirement. The decision to declare a mistrial on the basis of this record was an abuse of discretion.

### III.

We fully appreciate the significance of our decision here. Our conclusion that the defendant's double jeopardy rights were violated by the district court's premature declaration of a mistrial means that the indictment must be dismissed. The defendant, who is presently incarcerated, cannot be retried on these charges. Such consequences emphasize the need for careful consideration of alternatives to a mistrial by the trial judge in the first instance. In light of the constitutional stakes, "the judge must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." Jorn, 400 U.S. at 486 (plurality opinion).

In this case, defense counsel suggested alternatives to the mistrial declaration, but the court refused to explore those alternatives. As a result, the court did not conduct the investigation necessary to determine the magnitude of the prejudice resulting from the presence of the Bible in the jury room and the potential efficacy of steps that might be taken to eradicate the prejudice. The court's failure to conduct an adequate investigation leaves us with a record that does not support the

finding that the mistrial was manifestly necessary.  In the absence of such record support, Lara's "'valued right to have his trial completed by a particular tribunal' is not to be foreclosed."  <u>See</u> <u>Pierce</u>, 593 F.2d at 419 (quoting <u>Jorn</u>, 400 U.S. at 484-85).  Accordingly, we are compelled to hold that the district court abused its discretion in denying the motion to dismiss, and we must remand the case to the district court with instructions to vacate the defendant's conviction and dismiss the indictment.

<u>So ordered</u>.