# United States Court of Appeals
## For the First Circuit

No. 18-1873

UNITED STATES OF AMERICA,

Appellant,

v.

CHARLES W. GARSKE, A/K/A CHUCK GARSKE;
RICHARD J. GOTTCENT; MICHAEL SEDLAK,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Thompson, Selya, and Barron,
Circuit Judges.

Cynthia A. Young, Assistant United States Attorney, with whom Andrew E. Lelling, United States Attorney, was on brief, for appellant.

David Spears, with whom Josiah Pertz, Spears & Imes LLP, Justine Harris, Michael Gibaldi, Sher Tremonte LLP, William J. Cintolo, Meredith Fierro, and Cosgrove, Eisenberg & Kiley, PC were on joint brief, for appellees.

September 20, 2019

**SELYA**, **Circuit Judge**.  This appeal requires us to address a novel question implicating the Double Jeopardy Clause.  See U.S. Const. amend. V.  Concluding, as we do, that the district court erred in holding that the defendants were insulated from a retrial by double jeopardy principles, we reverse the district court's order of dismissal and remand the case for further proceedings consistent with this opinion.

## I. BACKGROUND

We briefly rehearse the relevant facts and travel of the case.  The reader who thirsts for more exegetic detail may wish to consult the district court's comprehensive account.  See United States v. Ackerly, 323 F. Supp. 3d 187, 190-92 (D. Mass. 2018).

On August 10, 2016, a federal grand jury sitting in the District of Massachusetts returned an indictment charging four defendants — Donna Ackerly, Charles Garske, Richard Gottcent, and Michael Sedlak — with multiple counts of wire fraud, honest-services wire fraud, and conspiracy to commit both species of wire fraud.  See 18 U.S.C. §§ 1343, 1346, 1349.  The indictment recounted that between September of 2007 and March of 2012, the four defendants conducted a fraudulent scheme while employed at Georgeson, Inc., a firm that specializes in advising public companies on positions that institutional investors are likely to take in voting their proxies with respect to corporate governance proposals.  The alleged scheme consisted of bribing an employee of

Institutional Shareholder Services, Inc. (ISS), a firm that advises institutional shareholder clients on how to vote on particular proxy issues, in exchange for confidential information about ISS's proxy-voting advice and then falsifying invoices to Georgeson's clients to cover the cost of the bribes.

Ackerly moved to sever, see Fed. R. Crim. P. 14(a), arguing that she was "peripheral at most" to the conduct alleged in the indictment and that severance would shield her from potentially prejudicial spillover attributable to the evidence against her codefendants. The government opposed Ackerly's motion, and the district court sustained the government's objection. Ackerly renewed her severance motion approximately one year later, but to no avail.

Trial began on February 26, 2018, with twelve jurors and two alternates empaneled. On the second day of trial, the district court excused a juror who failed to report for duty. On the fourth day of trial, the court excused a second juror for medical reasons. During the eleventh day of trial (Friday, March 16), the court told the jurors that the presentation of evidence would conclude on Monday, March 19, with final arguments and jury instructions to follow. Later that evening, a "distraught" Juror 12 contacted a district court clerk, explaining that his wife had gone to the hospital and he was concerned about continuing his jury service.

He subsequently told the clerk that his wife had been diagnosed with a brain tumor and would require surgery in the next few days.

At 10:32 a.m. on Saturday morning, at the direction of the district court, the clerk notified counsel by email about Juror 12's situation. The clerk wrote that Federal Rule of Criminal Procedure 23(b)(2)(B) "allows a reduction to 11 jurors with the written consent of the parties and the judge" and added that the court was "prepared to make the necessary finding of good cause and look[ed] to the parties to agree." Attorneys for Garske, Gottcent, and Sedlak all responded, indicating their clients' assent to proceeding with a jury of eleven. The government replied by email at 12:18 p.m. that it "consent[ed] to proceed with 11." At 2:53 p.m., the government clarified "that [its] consent is conditioned on all four defendants consenting." Ackerly's counsel weighed in at 4:15 p.m., reminding the court that Ackerly had sought severance from the inception of the case and stating that she would not consent. This email went on to assert that the government witnesses set to testify that Monday would "not offer any evidence against [Ackerly]," and that Ackerly was prepared to move for a judgment of acquittal. The government replied that the evidentiary record as to Ackerly was "not complete." Moreover, the government noted that it was "puzzled by [Ackerly's] reference to severance," expressing the view that it would be "terribly

- 4 -

inappropriate to use this circumstance in an attempt to achieve that result."

Later that afternoon, the clerk emailed the parties that she had communicated their positions to the district court. The email explained, inter alia, that the court would not entertain Ackerly's motion for judgment of acquittal and that it intended to enter a finding of good cause for Juror 12's excusal on Monday, March 19. Finally, the email stated that the court "accept[ed] the emails of the consenting defendants['] attorneys as made in good faith and believe[d] that the double jeopardy clause g[ave] . . . those defendants the right to proceed to a verdict with [the empaneled] jury." This email, however, proved to be premature. Shortly after it was sent, the clerk reported to the parties that the district court had just seen the government's second email — clarifying that its consent was conditional — and the court "fe[lt] it ha[d] no other choice than to declare a mistrial on Monday morning."

On Monday, the district court convened a non-evidentiary hearing. The court began by reiterating that the circumstances "constitute[d] good cause for the juror's excusal." Turning to Rule 23(b)(2), the court noted that the rule was "as clear as a rule could be" in stating that the parties, "which would necessarily include the government," must agree to proceed with a jury of fewer than twelve. Given the government's unwillingness

to consent to a reduced jury, the court acknowledged that "[t]here's no power that I see, or discretion that I have, under the rule to force any different result." The court then related that it had considered alternatives to the declaration of a mistrial but could think of only one: indefinitely postponing the trial pending the return of Juror 12. In the court's judgment, though, such an alternative was not feasible due to the uncertainty of the juror's wife's medical condition and the difficulty of supervising the other jurors in the interim. The parties suggested no other alternatives to a mistrial, but Garske, Gottcent, and Sedlak objected to a mistrial on the ground that the government's "conditional" consent did not demonstrate the requisite "manifest necessity."

At that point, the district court summoned the jury and explained what had transpired. The court declared a mistrial and discharged the jurors. The following day, the government announced that it intended to retry the defendants.

On April 27, 2018, Garske, Gottcent, and Sedlak filed a joint motion to preclude retrial and to dismiss the indictment under the Double Jeopardy Clause on the ground that the government could not establish "'manifest necessity' for its decision to force the mistrial." After hearing argument, the district court took the matter under advisement. In due course, the court handed down

- 6 -

a rescript and granted the motion to dismiss the indictment. This timely appeal followed.

## II. THE LEGAL LANDSCAPE

This case presents a question of first impression arising at the intersection of Federal Rule of Criminal Procedure 23 and the Double Jeopardy Clause. It implicates two competing rights: the right of all parties to have a criminal case decided by a jury of twelve and a criminal defendant's right not to be twice put in jeopardy. We lay the groundwork for our analysis by limning the applicable legal principles.

### A. Rule 23.

In Patton v. United States, 281 U.S. 276 (1930), the Supreme Court held that a criminal defendant has a constitutional right to a jury of twelve unless he waives that right. See id. at 312. The Court cautioned that "[i]n affirming the power of the defendant in any criminal case to waive a trial by a constitutional jury and submit to trial by a jury of less than twelve persons . . . , we do not mean to hold that the waiver must be put into effect at all events." Id. In amplification, the Court stated that "before any waiver can become effective, the consent of government counsel and the sanction of the court must be had, in addition to the express and intelligent consent of the defendant." Id. Relatedly, "the duty of the trial court in that regard is not

to be discharged as a mere matter of rote, but with sound and advised discretion."  Id.

The Patton Court's holding was later codified in Federal Rule of Criminal Procedure 23.  See Fed. R. Crim. P. 23 advisory committee notes to 1944 adoption.  Rule 23 declares that, except as otherwise provided in the rule, "[a criminal] jury consists of 12 persons."  Fed. R. Crim. P. 23(b)(1).  The rule contains a proviso, which states that "[a]t any time before the verdict, the parties may, with the court's approval, stipulate in writing that: (A) the jury may consist of fewer than 12 persons; or (B) a jury of fewer than 12 persons may return a verdict if the court finds it necessary to excuse a juror for good cause after the trial begins."  Fed. R. Crim. P. 23(b)(2).  It follows that, by virtue of the plain language of Rule 23, the consent of all parties and the court is generally required to try a case to verdict with a jury of eleven.[1]

## B. **Double Jeopardy.**

The Double Jeopardy Clause ensures that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  It provides "a triumvirate

---

[1]  There is an exception for situations in which jury deliberations already have begun.  See Fed. R. Crim. P. 23(b)(3) (authorizing district court to "permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds good cause to excuse a [deliberating] juror").  This exception is not implicated in the case at hand.

of safeguards:  'It protects against a second prosecution for the same offense after acquittal.  It protects against a second prosecution for the same offense after conviction.  And it protects against multiple punishments for the same offense.'"  United States v. Ortiz-Alarcon, 917 F.2d 651, 653 (1st Cir. 1990) (quoting North Carolina v. Pearce, 395 U.S. 711, 717 (1969)).  These safeguards attach once a criminal jury is sworn.  See United States v. Toribio-Lugo, 376 F.3d 33, 37 (1st Cir. 2004).  "That jeopardy attaches at this early stage, rather than at final judgment, is a recognition of the defendant's prized right to have his trial, once under way, completed by a particular trier."  Id.

Even so, the prophylaxis of the Double Jeopardy Clause is not absolute.  See Wade v. Hunter, 336 U.S. 684, 688 (1949) (explaining that double jeopardy protection "does not mean that every time a defendant is put to trial before a competent tribunal he is entitled to go free if the trial fails to end in a final judgment").  When a mistrial occurs, the point at which double jeopardy principles bar a retrial is not always easy to plot.  The general rule is that a judge's decision to discharge an empaneled jury and declare a mistrial prior to verdict does not bar retrial when, "taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated."  United States v. Perez, 22 U.S. (9 Wheat.) 579, 580 (1824).  Although the determination of whether to

- 9 -

discharge the jury and declare a mistrial lies in the "sound discretion" of the trial court, id., "the prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar," Arizona v. Washington, 434 U.S. 497, 505 (1978). Specifically, "[t]he prosecutor must demonstrate 'manifest necessity' for any mistrial declared over the objection of the defendant." Id.

The Supreme Court has cautioned that the manifest necessity standard cannot "be applied mechanically or without attention to the particular problem confronting the trial judge." Id. at 506. So, too, the Court has warned "that the key word 'necessity' cannot be interpreted literally." Id. After all, "there are degrees of necessity," and the Court's jurisprudence "require[s] a 'high degree' [of necessity] before concluding that a mistrial is appropriate." Id. Thus, "[a] trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial." Illinois v. Somerville, 410 U.S. 458, 464 (1973).

**III. ANALYSIS**

Against this backdrop, we turn to the case at hand. We review the district court's allowance of a motion to dismiss on double jeopardy grounds, following the declaration of a mistrial,

for abuse of discretion. See Toribio-Lugo, 376 F.3d at 38. Within this rubric, we accept the district court's factual findings unless those findings are clearly erroneous. See id. (citing United States v. Bradshaw, 281 F.3d 278, 291 (1st Cir. 2002)). "Articulations of law engender de novo review." Id. (citing United States v. Keene, 287 F.3d 229, 233 (1st Cir. 2002)). And we remain mindful that "an error of law is always tantamount to an abuse of discretion." Torres-Rivera v. O'Neill-Cancel, 524 F.3d 331, 336 (1st Cir. 2008).

Re-examining its earlier decision to declare a mistrial, the court below concluded that

> [w]ere the issue to turn solely on the operation of Rule 23, it would be difficult to imagine a necessity more manifest: the Rule plainly dictates that in circumstances like these, a trial cannot proceed with less than twelve jurors without the consent of all parties, and that includes the government.

Ackerly, 323 F. Supp. 3d at 201 (emphasis in original). But, the court explained, "the issue is more complex than a strictly rule-based analysis would suggest. While [Rule 23] may excuse the trial judge for declaring a mistrial (at least where there is no practical or feasible alternative), the [manifest necessity] doctrine also implicates the decision-making of the government." Id. Analogizing to the Supreme Court's pronouncement that "the prosecutor must shoulder the burden of . . . demonstrat[ing] 'manifest necessity' for any mistrial declared over the objection

of the defendant," id. at 202 (quoting Washington, 434 U.S. at 505), the district court ruled that when "the prosecutor plays a prominent role in bringing about the necessity of a mistrial, the 'manifest necessity' standard applies to the government's decision-making with the same force as it does to the actions taken by the trial judge," id.

On this understanding, the district court framed the dispositive question as: "Can the government, in the circumstances of this case, point to a 'manifest necessity' for the withholding of its consent to a verdict by a jury of eleven one day before a month-long trial was coming to an end?" Id. Answering its own question in the negative, the court granted the joint motion of Garske, Gottcent, and Sedlak for dismissal of the charges against them. See id. at 203.

The district court's focus on the manifest necessity of the government's decisionmaking is novel and, in our view, rests on a misreading of Washington. We do not gainsay that in order to retry a defendant after a mistrial, the government must carry the burden of showing "'manifest necessity' for [the] mistrial." Washington, 434 U.S. at 505. But this burden is not — as the district court suggests — a burden to show manifest necessity for the government's decisionmaking. Instead, it is a burden to show manifest necessity for the district court's decision to declare a mistrial. See id. at 514 (explaining that "reviewing courts have

- 12 -

an obligation to satisfy themselves that . . . the trial judge exercised 'sound discretion' in declaring a mistrial" (quoting Perez, 22 U.S. at 580)); Toribio-Lugo, 376 F.3d at 39 (suggesting that the manifest necessity "inquiry inevitably reduces to whether the district judge's declaration of a mistrial was reasonably necessary under all the circumstances" (quoting Keene, 287 F.3d at 234)); see also Perez, 22 U.S. at 580 (stating that there must be "manifest necessity for the act" of declaring a mistrial (emphasis supplied)).

Washington illustrates this point. There, the trial judge granted the government's motion for a mistrial due to prejudicial comments in defense counsel's opening statement. See 434 U.S. at 498, 501. The Supreme Court trained the lens of its inquiry on whether the judge "act[ed] precipitately in response to the prosecutor's request for a mistrial," not on the prosecutor's decision to make such a request. Id. at 515. The Court concluded that, because the judge "exercised 'sound discretion' in handling the sensitive problem of possible juror bias created by the improper comment of defense counsel, the mistrial order [was] supported by the 'high degree' of necessity which is required in a case of this kind." Id. at 516.

The Supreme Court's decision in Somerville is similarly instructive. There, the prosecutor moved for a mistrial after spotting a fatal defect in the indictment. See 410 U.S. at 459-

- 13 -

60. Concluding that further proceedings under the defective indictment would be futile, the trial judge granted the prosecutor's motion. See id. at 460. The Court determined that there was manifest necessity for the judge's decision to declare a mistrial, explaining that "where the declaration of a mistrial . . . aborts a proceeding that at best would have produced a verdict that could have been upset at will by one of the parties, the defendant's interest in proceeding to verdict is outweighed by the competing and equally legitimate demand for public justice." Id. at 471. The Court did not, however, inquire into the reasons for the government's faulty indictment.

Although the Somerville Court kept the focus of the manifest necessity inquiry squarely on the trial judge's actions, it did not categorically dismiss the relevance of the government's role in causing a mistrial. The Court explained that "[a] trial judge properly exercises his discretion to declare a mistrial" if "a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error." Id. at 464. The Court hastened to add that "[i]f an error would make reversal on appeal a certainty, it would not serve 'the ends of public justice' to require that the Government proceed with its proof when, if it succeeded before the jury, it would automatically be stripped of that success by an appellate court." Id. (quoting Perez, 22 U.S. at 580). Importantly, the Court qualified these

- 14 -

statements by noting that "the declaration of a mistrial on the basis of a rule or a defective procedure that would lend itself to prosecutorial manipulation would involve an entirely different question." Id. (emphasis supplied). Nothing in the Court's discussion, however, suggests that the manifest necessity test used to determine the propriety of the trial judge's decision to declare a mistrial is the relevant metric for assessing prosecutorial exploitation of a rule or procedure.

Washington and Somerville light the path that we must tread. There is nothing either in those opinions or elsewhere in the Supreme Court's double jeopardy jurisprudence that affords any basis for applying the manifest necessity doctrine to the decisionmaking of the government (as opposed to that of the trial court). Such an application would represent a substantial — and ungrounded — expansion of the manifest necessity doctrine.

This is not to say that the actions of the government never factor into the double jeopardy inquiry. As Somerville intimates, those actions may have relevance to that inquiry. Indeed, they may sometimes be of critical import because "the Double Jeopardy Clause provides a defendant with a shield against prosecutorial maneuvering designed to provoke a mistrial." United States v. McIntosh, 380 F.3d 548, 557 (1st Cir. 2004) (citing Oregon v. Kennedy, 456 U.S. 667, 674 (1982)); see United States v. Dinitz, 424 U.S. 600, 611 (1976). Thus, even if manifest necessity

exists for the trial judge's decision to declare a mistrial, a retrial may be foreclosed "if the prosecutor purposefully instigated a mistrial or if he committed misconduct designed to bring one about." McIntosh, 380 F.3d at 557.[2]

When all is said and done, a defendant whose trial was terminated prior to verdict can invoke the double jeopardy bar in one of two situations. First, if the defendant objected and the trial judge's decision to declare a mistrial was unsupported by some manifest necessity, double jeopardy will foreclose a second trial. See id. at 553; United States v. Simonetti, 998 F.2d 39, 41 (1st Cir. 1993). Second, if the prosecution either deliberately instigated the mistrial or engaged in other misconduct causing the mistrial, double jeopardy will foreclose a second trial. See McIntosh, 380 F.3d at 557; Simonetti, 998 F.2d at 42.

The defendants have a more expansive view of double jeopardy. They argue that their constitutional right to proceed

---

[2] The defendants strive to persuade us that this standard "has no relevance to this case" because they did not request the mistrial. We are not convinced. Although Kennedy and Dinitz both involved defendants who had sought mistrials, see Kennedy, 456 U.S. at 668; Dinitz, 424 U.S. at 601, we see no reason why prosecutorial misconduct would not similarly activate the double jeopardy bar when the defendant objected to the mistrial, cf. McIntosh, 380 F.3d at 552, 557 (analyzing claim that retrial was barred by prosecutor's actions that "were both improper and designed to provoke a mistrial" when defendants had objected to mistrial on the basis of such actions); United States v. Simonetti, 998 F.2d 39, 41-42 (1st Cir. 1993) (considering defendant's argument that retrial was barred because mistrial declared over his objection was "caused by governmental misconduct").

with an already-empaneled jury "takes precedence" over the government's right to withhold consent to a jury of eleven. According to the defendants, "neither Patton nor Rule 23(b)(2)(B) was intended to give the government an automatic right to retry a defendant before a new jury simply by refusing to consent to fewer than 12 jurors and thereby compelling a mistrial over a defendant's objection." Since "the government was the exclusive agent of the mistrial," their thesis runs, its reason for withholding consent to an eleven-member jury must satisfy the manifest necessity standard. Referencing several cases in which courts have found no manifest necessity when a district court chose to declare a mistrial rather than sever a defendant's case,[3] see, e.g., United States v. Chica, 14 F.3d 1527, 1532-33 (11th Cir. 1994); United States v. Allen, 984 F.2d 940, 942 (8th Cir. 1993); United States v. Crotwell, 896 F.2d 437, 440 (10th Cir. 1990); United States v. Ramirez, 884 F.2d 1524, 1530 (1st Cir. 1989); United States v. Bridewell, 664 F.2d 1050, 1051 (6th Cir. 1981) (per curiam), the defendants insist that concerns about judicial economy cannot satisfy the manifest necessity standard.

As an initial matter, we disagree with the defendants' attempt to brand the government as the architect of the mistrial.

---

[3] For the sake of completeness, we note that none of the three defendants who are appellees here moved for a severance at or after the time when Ackerly refused to consent to proceeding with a jury of eleven.

- 17 -

Although the government's decision to withhold consent to a jury of eleven technically precipitated the mistrial, the root cause of the mistrial was Juror 12's sudden unavailability due to his wife's medical emergency. Once Juror 12 was excused, the remaining eleven jurors no longer comprised a constitutional jury, see Patton, 281 U.S. at 312, and the trial was stopped in its tracks. It could proceed only if the strictures of Rule 23(b)(2)(B) were satisfied.

Of course, the right to a constitutional jury may be waived. Such a waiver is permitted, though, only with "the consent of government counsel and the sanction of the court." Id. The government is under no obligation to consent to a jury of eleven, and the defendants' entitlement to waive trial by a jury of twelve does not carry with it an entitlement to override the government's unwillingness to consent. Cf. Singer v. United States, 380 U.S. 24, 34-35 (1965) ("The ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right."). Seen in this light, keeping the focus of the manifest necessity inquiry on the trial judge's decision to declare a mistrial, rather than switching the focus to the government's decision to withhold consent to a jury of eleven, does not impermissibly elevate the government's right to withhold consent under Rule 23 above the defendants' double jeopardy rights.

Nor would such a focus impair the defendants' double jeopardy protections. Although these protections attach when a

jury is sworn, see Toribio-Lugo, 376 F.3d at 37, "unforeseeable circumstances that arise during a trial [may make] its completion impossible," Somerville, 410 U.S. at 470 (quoting Wade, 336 U.S. at 689). In such an event, "a defendant's valued right to have his trial completed by a particular tribunal must . . . be subordinated to the public's interest in fair trials designed to end in just judgments." Id. (emphasis omitted) (quoting Wade, 336 U.S. at 689); see Dinitz, 424 U.S. at 609 n.11 (explaining that "the defendant's interest in going forward before the first jury [is not] a constitutional right comparable to the right to counsel"). So it is here: a circumstance beyond the control of the parties and the district court rendered the empaneled jury unconstitutional. Although the defendants were entitled to waive their right to a constitutional jury, they had "no absolute right to proceed with a jury of less than twelve." Parker v. United States, 507 F.2d 587, 589 (8th Cir. 1974); see United States v. Ruggiero, 846 F.2d 117, 124 (2d Cir. 1988) (concluding that "a court can grant a mistrial even where the defendant files a motion to proceed with a jury of eleven"). They needed the consent of both the government and the district court, and that consent was not forthcoming.

We have been unable to find a case directly on point. But we think that a fair analogy can be drawn to cases in which courts of appeals have found no double jeopardy bar when a trial

- 19 -

judge refused to allow a case to continue to verdict with a jury that had shrunk to eleven members. See Parker, 507 F.2d at 589-90 (finding that trial judge had discretion to declare mistrial when one of three defendants refused to consent to jury of eleven); United States v. Potash, 118 F.2d 54, 56 (2d Cir. 1941) (explaining that when one juror became incapacitated, "the court had discretion to discharge the jury, even if both parties had consented . . . to proceed with the reduced number"); Gardes v. United States, 87 F. 172, 177 (5th Cir. 1898) (finding manifest necessity for mistrial due to juror's death when trial court declined to allow parties to proceed with jury of eleven).

The severance cases on which the defendants rely are inapposite. When a mistrial is unavoidable with respect to one defendant in a partially completed two-defendant trial, considerations of judicial economy, without more, cannot justify the trial judge's refusal to sever the other defendant and allow him to continue separately to a verdict with an already-empaneled jury. See, e.g., Chica, 14 F.3d at 1532-33. Those cases rest solidly on the proposition that "judicial economy, standing alone, does not support a finding of manifest necessity." Id. (collecting cases). In the last analysis, the court's interest in judicial economy cannot outweigh a defendant's valued right to continue to a verdict with an already-empaneled jury.

Here, however, the finding of manifest necessity does not rest to any degree on considerations of judicial economy. The district court had no viable option to allow Garske, Gottcent, and Sedlak to proceed with the already-empaneled jury. Accordingly, this is not a case in which the district court may be said to have put its interest in judicial economy above the defendants' valued right to double jeopardy protections.

Instead, the district court's rationale for the declaration of a mistrial was the unavailability of the twelfth juror (due to circumstances beyond the parties' control). This rationale strongly supports a finding of manifest necessity, and the severance cases do not diminish the strength of that support.

The short of it is that it was an error of law for the district court to apply the manifest necessity standard to the government's decision to withhold consent to a jury of eleven. The correct approach would have been for the court to have inquired whether there was manifest necessity for the declaration of a mistrial and, if so, to inquire whether the government helped to bring about that manifest necessity through some misconduct or purposeful instigation. The record makes the answers to these inquiries pellucid.

We start with manifest necessity itself. In determining whether there was manifest necessity for a mistrial, it is useful to consider three interstitial factors: "(1) whether the district

court consulted with counsel; (2) whether the court considered alternatives to a mistrial; and (3) whether the court adequately reflected on the circumstances before making a decision." McIntosh, 380 F.3d at 554 (citing Simonetti, 998 F.2d at 41). These factors, though, "serve only as a starting point." Id. "Each case is sui generis and must be assessed on its idiosyncratic facts." Id.

In this instance, it is nose-on-the-face plain that there was manifest necessity for the district court's declaration of a mistrial: the court was left with a constitutionally deficient jury of eleven. The court tried to avoid a mistrial by requesting that the parties consent to a jury of eleven. Cf. Toribio-Lugo, 376 F.3d at 39 (finding no manifest necessity when "[t]he court never offered the appellant a choice between proceeding with eleven jurors or accepting a mistrial"). Once it became apparent that universal consent would not be forthcoming, the court explored the possibility of delaying the trial indefinitely. But such an alternative was not feasible, the court reasonably concluded, given the unpredictability of how long Juror 12 would be unavailable and the difficulties inherent in attempting to supervise the remaining eleven jurors in the interim. Seeking additional ideas, the court solicited the parties — but none of them offered any helpful suggestions.

Nor did the court act rashly. It mulled the mistrial decision over the course of several days and decided upon a course of action only after requesting consent from all parties and seeking their input on potential alternatives. The court recognized that it had no power to force either side to proceed to verdict with eleven jurors. As the court aptly observed, its "[h]ands [were] tied." Ackerly, 323 F. Supp. 3d at 192.

"Where, as here, the district court fully considers, but reasonably rejects, lesser alternatives to a mistrial, we will not second-guess its determination." McIntosh, 380 F.3d at 556. We thus hold that there was manifest necessity for the district court's carefully reasoned decision to declare a mistrial.

This brings us to the matter of whether the government's decision to withhold its consent to proceeding with a jury of eleven constituted either misconduct or purposeful instigation of a mistrial. On its face, that decision was not misconduct: it was the government's prerogative under Rule 23 to decline to consent to a jury of less than twelve. See Fed. R. Crim. P. 23(b)(2). The slightly closer question is whether the government's decision to withhold its consent, knowing that a mistrial would ensue, was the functional equivalent of purposeful instigation of a mistrial. We think not.

In conducting this inquiry, intent is a central element. Even when a prosecutor's conduct is the but-for cause of a

- 23 -

mistrial, such conduct — including that which "might be viewed as . . . overreaching" — does "not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." Kennedy, 456 U.S. at 675-76; see McIntosh, 380 F.3d at 557 (explaining that "prosecutorial error or even prosecutorial harassment that results in a mistrial will not unlatch the double jeopardy bar in the absence of the intent to cause a mistrial" (citing Creighton v. Hall, 310 F.3d 221, 227 (1st Cir. 2002))). It follows that the government's knowledge that withholding consent to move forward with a jury of eleven would cause a mistrial is not enough to bar a retrial absent an intent to abridge the defendants' double jeopardy rights. Here, we discern no indication of any such intent.

To begin, the removal of Juror 12 was brought about by his wife's sudden illness, not by any act attributable to the government or within its control. As the district court acknowledged, "it is unfair to say that [the government] caused the mistrial any more than [it is to say] that Defendant Ackerly forced the mistrial, as both were exercising a right granted to them by Rule 23." Ackerly, 323 F. Supp. 3d at 194 (citation and internal quotation marks omitted). Moreover, the district court made explicit findings that "the government's conduct [was] not infected with any hint of improper motive," id., and that the government had done "nothing reproachable or in bad faith," id. at

- 24 -

203.  To cinch the matter, the court found that this was not a case in which the government "refused consent to go forward with eleven jurors because it was not sanguine about its chances of winning a conviction."  Id. at 194.

We think it important that, in evaluating the government's preference to try all four defendants together, the district court found only that "the government's decision to withhold consent was influenced by a desire to submit all four defendants to the jury for a verdict."  Id. at 202.  Merely being "influenced" by such a legitimate desire does not evince an intent to instigate a mistrial, particularly where, as here, the district court has made no finding that the number of jurors was irrelevant to the government's decision.  In short, this is not a case in which the record indicates either that the government's exclusive motivation in withholding consent was to evade severance (a goal Rule 23(b)(2)(B) does not serve) or that the government had no bona fide interest in asserting its right to a jury of twelve (the interest underlying Rule 23(b)(2)(B)).

The district court's findings are supported by the record and, thus, are not clearly erroneous.  Cf. United States v. Flete-Garcia, 925 F.3d 17, 26 (1st Cir. 2019) (stating that "[i]f two plausible but competing inferences may be drawn from particular facts, a [district] court's choice between those two competing

inferences cannot be clearly erroneous").  Consequently, we are bound to accept them.  See Simonetti, 998 F.2d at 42.

The defendants have a fallback position:  they contend that the government took "unfair advantage of a mistrial" by withholding consent to proceed with eleven jurors after having "enjoyed a full view of [the defendants'] defenses."  Such an advantage was evidenced at Ackerly's retrial, the defendants say, since "the government demonstrated that it had learned from its lapses in the first trial" by not calling several witnesses whose credibility had been undercut on cross-examination.

This contention is composed of more cry than wool.  As the government accurately explained, the district court had allotted twenty hours of trial time per side in the original trial but reduced that amount to eleven hours per side for Ackerly's retrial.  As a result, the government had "to cut almost half of its previous trial presentation."  It is pure speculation to suggest that the government's use of this reduced time was unfairly advantaged by the earlier trial proceedings.  We say "unfairly" because any time that a mistrial occurs near the end of a case, each side will have had a preview of the other's case.  In other words, the purported advantage works both ways.  Here, for instance, the defendants have previewed the government's case and are now better positioned to defend against it.

To sum up, the right to trial by a jury of twelve is a right that is shared by the government and the defense. The government was entitled under Rule 23 to withhold its consent to an eleven-person jury and made a fully permissible election. As the district court acknowledged, "Rule 23 permits the government to exercise its right to withhold consent without requiring any explanation or justification of its reasons for doing so." Ackerly, 323 F. Supp. 3d at 194. Here, though, the government was not shy about its reasons: the government's exercise of its right to withhold consent under Rule 23(b)(2)(B) was entirely consistent with its long-held and staunchly asserted position that the interests of justice would best be served by trying all the defendants together.[4] The government had no role in causing the unavailability of the twelfth juror, and we do not think that it should be given the Hobson's choice of trying three of the indicted coconspirators apart from the fourth with a jury of eleven or not at all. When — as in this case — the government's reasons for

---

[4] Even while this appeal was pending, the government persisted in trying to keep the four defendants together. To that end, it moved under 18 U.S.C. § 3161(h)(7)(A) to exclude from Ackerly's speedy trial calculations the time that would elapse until the appeal was resolved. Ackerly opposed the motion and the district court denied it, scheduling Ackerly's trial to begin on January 7, 2019. The government twice moved for reconsideration, repeatedly imploring the district court to delay Ackerly's trial and preserve the possibility of trying all four defendants together. The court denied both motions and went ahead with Ackerly's case. Ackerly was convicted on January 15, 2019, following a week-long jury trial.

withholding its consent under Rule 23(b)(2)(B) are completely above-board, double jeopardy principles should not prevent the government from retrying the defendants. Elsewise, "the ends of public justice would . . . be defeated." Perez, 22 U.S. at 580.

To say more would be to paint the lily. Because the district court's decision to declare a mistrial rested on manifest necessity and because that mistrial was not the product of any purposeful instigation or other government misconduct, double jeopardy principles do not prohibit the government from retrying Garske, Gottcent, and Sedlak.

## IV. CONCLUSION

We need go no further. For the reasons elucidated above, we reverse the order dismissing the indictment as to Garske, Gottcent, and Sedlak and remand for further proceedings consistent with this opinion.

**Reversed and remanded.**