# United States Court of Appeals
## For the First Circuit

No. 22-1727

UNITED STATES OF AMERICA,

Appellee,

v.

BRIAN DENNISON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Kayatta, Selya, and Howard,
Circuit Judges.

Thomas F. Hallett, with whom Hallett Whipple Weyrens was on brief, for appellant.
Brian S. Kleinbord, Assistant United States Attorney, with whom Darcie N. McElwee, United States Attorney, was on brief, for appellee.

July 13, 2023

**SELYA**, **Circuit Judge**.  Managing a jury trial at a time dominated by a pandemic poses difficult challenges for the presiding judge.  This case is emblematic of those challenges.  The tale follows.

Building on the foundational claim that the district court's pandemic-driven declaration of a mistrial was not predicated on manifest necessity, defendant-appellant Brian Dennison alleges an infringement of his constitutional right not to be twice put in jeopardy for the same offense.  See U.S. Const. amend. V.  Concluding, as we do, that the district court's declaration of a mistrial was within the encincture of its discretion and that the defendant's Fifth Amendment right will not be offended by further prosecution, we affirm the district court's denial of the defendant's motion to dismiss.

**I**

In September of 2021, a federal grand jury sitting in the District of Maine charged the defendant with a single count of transmitting a threatening communication in interstate commerce.  See 18 U.S.C. § 875(c).  After preliminary proceedings, a trial was scheduled to start on May 23, 2022, and the district court allotted three days for that purpose.

In the lead-up to the trial, the COVID-19 pandemic was a continuing cause of concern.  Responding to that concern, the United States District Court for the District of Maine had — by

- 2 -

way of a General Order — instituted measures to mitigate the risk of contagion.[1] Persons involved in jury trials were required to wear facemasks, although those with speaking roles were permitted to remove their masks before speaking, as long as they were fully vaccinated and had tested negative for COVID-19 that same day. Anyone who tested positive for COVID-19 within a ten-day period was barred from the courthouse until satisfying the quarantine requirements promulgated by the United States Centers for Disease Control and Prevention (CDC). Throughout pretrial proceedings, the parties were repeatedly reminded to familiarize themselves with the General Order.

The court's pandemic response included altering its operations in the Portland courthouse (where the defendant was to be tried). Instead of using all three of the courtrooms for trials, the district court reserved one courtroom for trials and one for jury assembly and deliberations (seemingly to allow the jurors more room to achieve social distancing). The third courtroom was left vacant as a precautionary measure until the General Services Administration had evaluated the courthouse's air-filtration system.

---

[1] The court's concern appears to have been especially acute at the time of trial as the judges of the district court amended the General Order on May 20, 2022, to respond (in the amendment's own words) "to a substantial increase in the spread of COVID-19."

It was against this backdrop that the defendant's case proceeded to trial. On May 22, 2022, the government sought to postpone the presentation of evidence by a day because its lead-off witness had been delayed at the airport by inclement weather. The defendant consented to the postponement. The court, in turn, reminded the parties that due to the restrictions under which the courthouse was operating, it was imperative that the trial conclude within the remaining two days that had been allotted. Counsel for both parties assured the court that the case could be concluded within that time span.

Trial commenced on May 24. The jury was sworn and given preliminary instructions by the court, the lawyers delivered their opening statements, and the government began to present its case. Part way through that morning, the government called United States Border Patrol Agent Jonathan Duquette as a witness. Agent Duquette — assigned to a Federal Bureau of Investigation task force out of the Boston field office — was not only the government's main witness but also the case agent (a designation that entitled him to assist the prosecution in the courtroom throughout the trial, see Fed. R. Evid. 615(b)). He had taken the lead in investigating the threat allegedly made by the defendant, and his testimony was expected to introduce evidence essential to the government's case.

Agent Duquette wore a facemask at the outset of his testimony. During the court's scheduled mid-morning recess,

- 4 -

though, he took a rapid COVID-19 test so that he could continue testifying without a facemask. The result of that test came back positive for COVID-19. As the trial was set to resume, the court was notified of that result.

The court alerted the parties and immediately initiated a discussion as to whether it was feasible for the trial to continue. The court suggested that the General Order had not anticipated precisely such a situation and that it was inclined to permit Agent Duquette to testify, despite having tested positive for COVID-19, as long as he was masked and kept at a distance from the jurors. The government was amenable to that suggestion, but it expressed concern over the absence of Agent Duquette as the case agent for the remainder of the trial. For his part, defense counsel tentatively expressed a willingness to move forward with the trial, assuming that appropriate protective measures were taken. During the ensuing dialogue, the prosecutor stated that the government would try to find a substitute case agent to take Agent Duquette's place and that if Agent Duquette were permitted to complete his testimony, the government could continue to present its case.

After hearing the initial positions of the parties, the court took a brief recess to ponder the matter. Slightly more than fifteen minutes later, the court returned to the courtroom to consult with the parties. It stated:

Now, the — having the witness testify knowing that he is possibly infected because of a positive test is contrary to the Court's general orders, and it seems to me that it would be necessary for the Court to inform all of the persons in the courtroom, and in particular the jurors, of what we know, and that is that this witness tested positive, which could be a source of some concern for one or more of the jurors. And so it seems to me that it's important to weigh the effect that that might have on this trial with — against the effect of or the value of simply proceeding.

I don't think that it's appropriate to not inform the jurors of what we know about Mr. Duquette or, for that matter, the individuals who are in the courtroom. So they will be informed. It also seems to me that it is not, although I've considered this possibility, wise to give the choice — the jurors the personal choice of continuing to serve or being based upon their receipt of the information regarding Mr. Duquette. Even if [twelve] or more were to indicate a willingness to continue, I remain concerned, first of all, there is some health risk of us all continuing to proceed in a courtroom with an infected person, known to be infected, and that also this is the type of question which is upsetting for many people and could cause them upon reflection perhaps to change their mind about continuing to participate. So continuing with the trial under these conditions it seems to me is fraught with the possibility of complexity.

Of course, I have to weigh this against Mr. Dennison's rights. The trial's begun; our resources have been expended; [defense counsel has] indicated his client would like to continue notwithstanding this information. And that also of course it seems to me is extremely important.

- 6 -

> As I've weighted this, counsel, I've concluded tentatively that the most just way to respond to this unusual set of circumstances is to declare a mistrial. The rule provides that before ordering a mistrial the Court is to give each side, the defendant and the Government, the opportunity to comment on the propriety of the order, to state whether the party consents or objects, and to suggest alternatives. And so that's where we are at this moment.

Before making a final decision, the court wisely solicited the views of counsel. See Fed. R. Crim. P. 26.3. Defense counsel stated that although he understood the court's reasoning, he objected generally to the declaration of a mistrial — and he reiterated the defendant's desire to go forward with the trial. At no time, however, did he propose to the court any mitigating measures short of a mistrial. In turn, the prosecutor offered the district court a mixed bag: he equivocated on whether the trial ought to continue, expressing concern over whether jurors would be able to focus on Agent Duquette's testimony or would be prejudiced against the government for proffering a witness who might infect them. Nevertheless, the prosecutor wound up by saying that he would defer to the judgment of the court.

The court then summoned the jury. At sidebar, defense counsel objected to the declaration of a mistrial on the ground that retrying the case would unfairly advantage the government, which was now apprised of the defendant's trial strategy (having heard defense counsel's opening statement) and could shore up any

- 7 -

weaknesses in its case. The court replied that because the defendant had yet to present any evidence, defense counsel's stated concern did not outweigh the reasons previously articulated by the court for declaring a mistrial.

In due course, the court informed the jurors that Agent Duquette had tested positive for COVID-19 and that, therefore, he was no longer permitted in the courthouse as per the General Order. The court then explained that because a key witness had been rendered unavailable on the first day of the trial, and because everyone in the courtroom had been indirectly exposed to COVID-19, it was ordering a mistrial. The jurors were dismissed.

Following the mistrial, the defendant moved to dismiss the indictment on double jeopardy grounds. The motion to dismiss was denied by way of a written memorandum, and this interlocutory appeal ensued. The appeal is properly before us. Although a criminal defendant may not, in the ordinary course, appeal an interlocutory order, an exception applies where, as here, "a defendant can 'mount a colorable claim that further proceedings in the trial court will constitute double jeopardy.'" United States v. Suazo, 14 F.4th 70, 74 (1st Cir. 2021) (quoting United States v. Keene, 287 F.3d 229, 232 (1st Cir. 2002)); see Abney v. United States, 431 U.S. 651, 662 (1977).

The Double Jeopardy Clause provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The principle undergirding the Clause's prohibition is that the government "with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense." Green v. United States, 355 U.S. 184, 187 (1957). Doing so would unfairly subject a defendant to the continued ignominy, strain, and expense that inevitably accompany criminal prosecution — and it would also increase the likelihood that an innocent defendant might be found guilty. See id. at 187-88.

Because jeopardy attaches once a criminal jury is sworn, see United States v. Garske, 939 F.3d 321, 328 (1st Cir. 2019), the Clause affords a defendant a "valued right to have his trial completed by" that jury, Arizona v. Washington, 434 U.S. 497, 503 (1978) (quoting Wade v. Hunter, 336 U.S. 684, 689 (1949)). As a general rule, then, "the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial." Id. at 505. In the event of a mistrial, though, the defendant's "valued right" stands in tension with "the public's interest in fair trials designed to end in just judgments." Wade, 336 U.S. at 689. To balance these concerns, courts have construed the Clause "to bar retrial of a defendant after a mistrial ordered over the

defendant's objection unless the mistrial was occasioned by manifest necessity." United States v. McIntosh, 380 F.3d 548, 553 (1st Cir. 2004). Although the prerogative for declaring a mistrial lies with the trial court, it is incumbent upon the government — if it is to skirt the double-jeopardy bar — to demonstrate that the mistrial was justified by manifest necessity. See Washington, 434 U.S. at 505.

Here, the defendant argues that the Double Jeopardy Clause forecloses the government from retrying the case. His argument proceeds in two steps: first, he asserts that we should employ a heightened standard of review because the mistrial was precipitated by the unavailability of a government witness; second, he asserts that — regardless of the standard of review — the district court erred in concluding that there was manifest necessity for a mistrial. We address these assertions sequentially.

### III

"The baseline standard of review applicable to a denial of a motion to dismiss on double jeopardy grounds following the declaration of a mistrial is abuse of discretion." United States v. Toribio-Lugo, 376 F.3d 33, 38 (1st Cir. 2004). The defendant, however, strives to put a somewhat different gloss on the standard of review that applies in this case. He points to a passage in the Supreme Court's decision in Arizona v. Washington, which states

that "the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused." 434 U.S. at 508. Drawing from this language, the defendant posits that because the unavailability of Agent Duquette was the impetus for the mistrial in this case, the district court's finding of manifest necessity should be reviewed through the prism of "strictest scrutiny."

We do not read Washington as setting forth a substantive framework for an alternative standard of review in double jeopardy cases. The passage to which the defendant alludes resides within a discussion of how the particular facts of a case may affect the deference with which an appellate court views a trial court's judgment to order a mistrial: at one end of the continuum lie cases in which a mistrial is accompanied by a valence of prosecutorial abuse such that the manifest-necessity determination should be viewed with less deference; at the other end of the continuum lie cases in which the possibility of prosecutorial abuse seems far-fetched (the paradigmatic example of which is a hung jury) and, therefore, the fact-specific nature of the trial court's determination should engender great deference. See id. at 508-10.

- 11 -

The language in Washington must be read in light of its contextual setting. There, the trial court had declared a mistrial after the defendant's attorney made prejudicial comments in his opening statement. See id. at 510. "[T]he difficulty which led to the mistrial," the Court stated, "[fell] in an area where the trial judge's determination is entitled to special respect." Id. And the Court's description of circumstances warranting "strictest scrutiny" was not essential to the reasoning of the opinion but, rather, was offered in dicta.

Even so, some of our sister circuits, citing this passage, have talked about applying a heightened standard of review when a mistrial is declared due simply to the unavailability of a key prosecution witness. See Seay v. Cannon, 927 F.3d 776, 781-85 (4th Cir. 2019); United States v. Fisher, 624 F.3d 713, 718-23 (5th Cir. 2010); United States v. Rivera, 384 F.3d 49, 56-58 (3d Cir. 2004); United States v. Stevens, 177 F.3d 579, 583-88 (6th Cir. 1999). What that heightened standard might entail is not entirely clear. Courts purporting to apply the standard have indicated that "strictest scrutiny" entails a close inspection as to whether the trial court carefully considered alternatives to a mistrial, see Fisher, 624 F.3d at 722; Rivera, 384 F.3d at 56, but that requirement is already inherent in the manifest-necessity inquiry.

A difference between abuse-of-discretion review and "strictest scrutiny" has been articulated by the Fourth Circuit, which has held that "strictest scrutiny" review mandates that a finding of manifest necessity will not be upheld unless the trial court, on the record, expressly assesses reasonable alternatives to a mistrial, see Seay, 927 F.3d at 784 — a requirement that departs from the Washington Court's deferential review, in which the Court upheld a manifest-necessity determination based on reasoning made apparent in the record as a whole, see Washington, 434 U.S. at 517. And other than the Fourth Circuit's requirement that the trial court's assessment of alternatives appear on the record, the test employed by courts under "strictest scrutiny" does not seem to differ substantively from the ordinary praxis of reviewing manifest-necessity determinations for abuse of discretion.

Of course, "[c]arefully considered statements of the Supreme Court, even if technically dictum, must be accorded great weight and should be treated as authoritative when . . . badges of reliability abound." United States v. Santana, 6 F.3d 1, 9 (1st Cir. 1993). Here, the Court's statement that the "strictest scrutiny" is warranted when a mistrial is required due to the unavailability of prosecution evidence plainly stems from concerns over "bad-faith conduct by [the] judge or prosecutor," whereby a mistrial might be declared that would serve to harass a defendant

- 13 -

with successive prosecutions or "afford the prosecution a more favorable opportunity to convict the defendant." Washington, 434 U.S. at 508 (internal quotation marks omitted) (quoting United States v. Dinitz, 424 U.S. 600, 611 (1976)). By way of example, the Court explained that "[i]f . . . a prosecutor proceeds to trial aware that key witnesses are not available to give testimony and a mistrial is later granted for that reason, a second prosecution is barred." Id. at 508 n.24 (citing Downum v. United States, 372 U.S. 734 (1963)). Considered in context, then, the dictum describing "strictest scrutiny" at most addresses only situations where some fault attributable to the prosecution necessitates a mistrial. See United States v. Simonetti, 998 F.2d 39, 41 n.6 (1st Cir. 1993).[2]

We have not had the opportunity in any earlier case to employ any variation of the "strictest scrutiny" standard, nor do we have any occasion to do so today. This case simply does not fit the Washington mold: on the record before us, fault for the mistrial, in the Washington sense, cannot be attributed to the government. At the time that the jury was empaneled, the government had no reason to believe that Agent Duquette would be

---

[2] To the extent that courts have gleaned from Washington a categorical rule that the unavailability of prosecution evidence, for any reason, engenders "strictest scrutiny" review, see Fisher, 624 F.3d at 720; Rivera, 384 F.3d at 56; Stevens, 177 F.3d at 584, we disagree.

unavailable to testify:  he was present at the start of the trial, and he was in the course of testifying when he tested positive for COVID-19.  There is not a shred of evidence that he exhibited any symptoms or was otherwise unwell at the outset of trial such that the government should have anticipated that he would test positive for COVID-19.  So viewed, this case is at a far remove from those cases in which the government gambled and went to trial "without first ascertaining whether or not [its] witnesses were present." Downum, 372 U.S. at 737 (quoting Cornero v. United States, 48 F.2d 69, 71 (9th Cir. 1931)); see Seay, 927 F.3d at 782; Walck v. Edmondson, 472 F.3d 1227, 1239 (10th Cir. 2007).  Put another way, Agent Duquette testing positive for COVID-19 was a random bit of misfortune, not the kind of "foreseeable possibility" that the government should have been obliged to anticipate at the time the jury was sworn.  Seay, 927 F.3d at 782.

This brings us full circle.  Although we recognize that other courts have made mention of a "strictest scrutiny" standard of review, we need not decide today the force, if any, that should be accorded to those decisions.  Such a standard, even were we to adopt it, would not apply to this case.  We proceed, therefore, to review the district court's denial of the defendant's motion to dismiss for abuse of discretion.  See Toribio-Lugo, 376 F.3d at 38.

Under this familiar standard, "we accept the district court's factual findings unless those findings are clearly erroneous," Garske, 939 F.3d at 329, and we review de novo "legal principles on which the court premised its decision," United States v. Lara-Ramirez, 519 F.3d 76, 83 (1st Cir. 2008) (quoting United States v. Bradshaw, 281 F.3d 278, 291 (1st Cir. 2002)). In conducting this tamisage, "we remain mindful that 'an error of law is always tantamount to an abuse of discretion.'" Garske, 939 F.3d at 329 (quoting Torres-Rivera v. O'Neill-Cancel, 524 F.3d 331, 336 (1st Cir. 2008)).

Abuse of discretion is a deferential standard of review, but it is not without some bite. It is not meant to provide a rubber stamp for the district court's discretionary determinations. Rather, when reviewing a trial court's declaration of a mistrial, we assess whether that decision reflected "a scrupulous exercise of judicial discretion," United States v. Jorn, 400 U.S. 470, 485 (1971), and was justified by a "high degree" of necessity, Washington, 434 U.S. at 506.

**IV**

The manifest-necessity inquiry eschews "any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial." Illinois v. Somerville, 410 U.S. 458, 462 (1973). Instead, the inquiry "reduces to whether the district

- 16 -

judge's declaration of a mistrial was reasonably necessary under all the circumstances." Keene, 287 F.3d at 234. In making that determination, we concentrate on three factors: "(1) whether the district court consulted with counsel; (2) whether the court considered alternatives to a mistrial; and (3) whether the court adequately reflected on the circumstances before making a decision." Garske, 939 F.3d at 334 (quoting McIntosh, 380 F.3d at 554). We caution, though, that those factors "serve only as a starting point," McIntosh, 380 F.3d at 554, and that our review must attend to "the particular problem [that] confront[ed] the trial judge," Washington, 434 U.S. at 506.

The defendant contends that the district court abused its discretion by declaring a mistrial without sufficiently considering alternative courses of action and without adequately reflecting on the circumstances at hand or engaging with counsel. As we explain below, we find both contentions unpersuasive.

**A**

"Where . . . the district court fully considers, but reasonably rejects, lesser alternatives to a mistrial, we will not second-guess its determination." McIntosh, 380 F.3d at 556. In the case at hand, the district court explored whether Agent Duquette could continue his testimony if he wore a facemask and was sufficiently isolated from the jury. But the district court's General Order foreclosed that possibility as it forbade Agent

Duquette from remaining in the courthouse once he had tested positive for COVID-19.[3]

Next, the district court considered asking jurors if they would be willing to continue with the trial despite the risk of exposure to COVID-19, but rejected that alternative. We think that it was reasonable, under the circumstances, for the court to forgo that course of action. The jurors had been assured that certain protections would be implemented to reduce the risk of exposure to COVID-19. They learned that despite those protections

_____

[3] The defendant claims that the district court misinterpreted its own General Order. The General Order mandated that those who tested positive for COVID-19 adhere to the CDC's "quarantine" requirements. But — according to the defendant — the CDC's website only set forth "isolation" requirements for those who tested positive for COVID-19, and any guidance concerning "quarantine" was limited to a set of recommendations that applied only to persons who had been exposed to (but had not tested positive for) the virus. The defendant further claims that the General Order only addressed circumstances in which someone who had either contracted or been exposed to COVID-19 was attempting to enter the courthouse and that it did not expressly address whether someone could remain in the courthouse after being informed, while there, that he had tested positive for COVID-19. Seizing on these semantic incongruities, the defendant argues that the General Order did not apply to Agent Duquette.

This argument is premised on a strained and hyper-technical reading of the General Order. The General Order referred readers to the guidance of the CDC, which — according to the defendant — stated that those who tested positive for COVID-19 were required to isolate themselves from others. That the General Order did not perfectly mirror the language of the CDC's guidance is of no consequence. There is no common-sense reading of the General Order and the CDC's guidance that would — when those documents are considered together — lend itself to the conclusion that Agent Duquette was permitted to remain in the courthouse after testing positive for COVID-19.

- 18 -

they had sat in the courtroom as a witness infected with COVID-19 testified. To ask them to continue sitting in the courtroom as that witness gave additional testimony in violation of the General Order that was intended to safeguard jurors does not strike us as a reasonable alternative that the court was obliged to accept. And we share the district court's concern that COVID-19, rather than the evidence, may have dominated the jurors' attention had the jurors been induced to run what to them could well be seen as a high level of risk. We add, moreover, that questioning the jurors about their willingness to continue was to some extent obviated by the fact that Agent Duquette, having tested positive for COVID-19, was barred from the courtroom under the terms of the General Order.

When confronted with the need to decide whether to declare a mistrial, the district court — like a quarterback in the red zone — must scan the field and mull all of the available options. Considering the myriad challenges posed at the relevant time by the virulence of the COVID-19 pandemic, we think that rejecting the alternatives discussed above was an appropriate exercise of the court's discretion.

On appeal, the defendant proffers several other alternatives that he suggests the district court should have explored more thoroughly before declaring a mistrial. He submits that the district court failed to question the jurors as to whether

they would have been willing to continue serving despite Agent Duquette testing positive for COVID-19; that the court failed to consider the possibility of a continuance; and that it failed to consider having Agent Duquette testify by video or, conversely, striking his testimony. We assume, favorably to the defendant, that our review of the court's failure to implement any of these alternatives is for abuse of discretion. We perceive none.

**1**

As to the defendant's suggestion that the court should have questioned jurors to discern whether they would have been comfortable continuing with Agent Duquette in the courtroom, it is nose-on-the-face plain, for reasons already discussed, that even if such a voir dire had yielded twelve jurors willing to continue in the presence of COVID-19, the path forward would have been, in the district court's phrase, "fraught with the possibility of complexity."

The defendant argues that our decision in Lara-Ramirez is to the contrary. His argument is wide of the mark. In Lara-Ramirez, we held that the declaration of a mistrial was not justified by manifest necessity when the judge had not thoroughly investigated a claim that the jury had been tainted by the presence of a Bible in the jury-deliberation room. See 519 F.3d at 86-87. Our opinion in Lara-Ramirez did not deal with the significantly different question of whether a trial could continue in the face

of psychological and emotional distractions accompanying a risk to health.[4]  The nature of the risks posed by COVID-19, especially at the time of the mistrial, sufficiently distinguishes this case. Accordingly, we hold that the district court did not abuse its discretion in declining to question the jury further.

**2**

Nor do we believe that it was an abuse of discretion not to order a continuance.[5]  It is by no means clear that a seven-to-ten-day adjournment, as the defendant now proposes, would have either been feasible under the circumstances or resolved the problems with which the district court was confronted.

---

[4] At the time it declared the mistrial, the district court stated that it was concerned with both the health risk posed by having Agent Duquette continue his testimony and the psychological effects that such a risk would have on the jurors.  But in its written memorandum denying the defendant's motion to dismiss, the district court disclaimed any concern about risks to physical health, instead stating that the mistrial declaration was premised "on the possible psychological and emotional effects on the jurors of being informed that they had been [exposed to COVID-19]."  For present purposes, we assume that the narrower reason described by the district court in its written memorandum was what the court considered in reaching its manifest-necessity determination.

[5] To be sure, the district court did not discuss the possibility of ordering a continuance on the record.  Although it would have been helpful for the purposes of appellate review if the district court had more fully described its reasoning, this is an instance where "[t]he basis for the trial judge's mistrial order is adequately disclosed by the record" as a whole.  Washington, 434 U.S. at 517.  Thus, an explicit discussion of a continuance as an alternative to a mistrial (especially when the defendant did not raise the issue at the time) was not "constitutionally mandated."  Id.

- 21 -

We start with the obvious:  nothing guaranteed that Agent Duquette's mandated quarantine would be brief.  The course of COVID-19 in any given individual is unpredictable.  It was, therefore, anyone's guess when Agent Duquette would again be available to testify; that would depend on the severity and duration of his symptoms — variables that were unknown and unknowable when the district court made its decision.  Moreover, the trial could only resume at that later date if all essential persons (including counsel, witnesses, and jurors) were themselves COVID-free — a difficult thing for a trial court to predict amidst an ongoing pandemic.

Compounding those uncertainties were the severe scheduling constraints under which the district court was operating.  Because the court's COVID-19 protocols had shrunk the courthouse's operations to a single courtroom, the district court, as it had told the parties in pretrial proceedings, had much less flexibility than it normally would to accommodate emerging exigencies.[6]

---

[6] The defendant argues that scheduling issues alone are insufficient to justify a finding of manifest necessity.  See Fisher, 624 F.3d at 723; Rivera, 384 F.3d at 56.  But even if we give that argument due weight, there is no rigid rule that excludes scheduling difficulties from consideration, among an array of pertinent factors, in forging the manifest-necessity determination.  See Jorn, 400 U.S. at 479-80 (explaining how myriad factors, including scheduling problems, may affect a finding of manifest necessity).  Here, a mix of factors — including the

Given this constellation of factors, the district court faced a possible continuance of indeterminate length. Consequently, we discern no abuse of discretion in the court's determination that a mistrial was manifestly necessary. See Garske, 939 F.3d at 334 (upholding district court's determination that continuing trial was not feasible alternative to mistrial when faced with "unpredictability" and indefinite nature of juror's absence).

**3**

The defendant next argues that the district court should have allowed Agent Duquette to testify by video or, conversely, should have struck his testimony. These arguments lack force.

For Agent Duquette to have testified by video, the defendant would have had to waive his right to confront adverse witnesses, see U.S. Const. amend. VI; see also United States v. Cotto-Flores, 970 F.3d 17, 37-38 (1st Cir. 2020) — a right that he showed no intention of relinquishing at the time. We believe that the responsibility for clarifying whether the defendant was willing to waive that right rested with the defendant, not with the trial court. Cf. Brookhart v. Janis, 384 U.S. 1, 4 (1966) ("There is a presumption against the waiver of constitutional rights, and for a waiver to be effective it must be clearly

---

scheduling difficulties caused by the district court's COVID-19 protocols — informed the manifest-necessity determination.

- 23 -

established that there was 'an intentional relinquishment or abandonment of a known right or privilege.'" (internal citation omitted) (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938))).

Nor was striking Agent Duquette's testimony a viable option because the district court supportably found that he was an essential witness. See United States ex rel. Gibson v. Ziegele, 479 F.2d 773, 777 (3d Cir. 1973) (finding mistrial justified by manifest necessity due to illness of essential witness). Nothing in the record shows that determination to be infected by any hint of error. See United States v. Fitzpatrick, 67 F.4th 497, 502 (1st Cir. 2023) ("Clear error will be found only when, upon whole-record-review, an inquiring court form[s] a strong, unyielding belief that a mistake has been made." (alteration in original) (internal quotation marks omitted) (quoting United States v. Cintrón-Echautegui, 604 F.3d 1, 6 (1st Cir. 2010))).

## B

This leaves the defendant's contentions that the district court failed to reflect sufficiently on the circumstances at hand and to solicit the views of counsel. The record belies these contentions.

Upon learning that Agent Duquette had tested positive for COVID-19, the district court asked for the views of counsel, adjourned to consider the matter, consulted with counsel once more, and then declared a mistrial. When the defendant's attorney was

asked to address the matter, he offered no substantive objection other than to complain that his defense strategy had been exposed. Having reflected upon the matter, and having received little, if any, meaningful feedback from the parties, the district court proceeded to declare a mistrial. In our judgment, this is not the stuff from which a defendant may weave a colorable claim of abuse of discretion.

The defendant demurs, contending that the district court's fifteen-minute recess was too brief to allow appropriate consideration of the matter. In support, he cites other cases in which we have upheld a district court's manifest-necessity determination after more lengthy periods of reflection and arguably more robust colloquies with the parties. See, e.g., Simonetti, 998 F.2d at 41-42. But in the context of the manifest-necessity inquiry, "[e]ach case is sui generis and must be assessed on its idiosyncratic facts." McIntosh, 380 F.3d at 554.

In reviewing a manifest-necessity determination, we are more concerned with the scope and quality of the district court's reflection than with the raw amount of time consumed. The case at hand is patently not a case in which the district court rushed headlong to abort a trial without endeavoring "to ascertain the [defendant's] attitude or wishes with regard to the possibility of a mistrial." Toribio-Lugo, 376 F.3d at 39. The record shows that the district court discussed the issue with the parties at adequate

length.  And even though the defendant tells us on appeal that he was uncertain about the district court's COVID-19 protocols and would have benefitted from a more detailed exposition of the district court's reasoning, he told the district court at the time that he understood the court's rationale.

We hold, therefore, that the district court's reflection and discussion with counsel were not so truncated as to constitute an abuse of discretion.  Rather, those actions manifest "a scrupulous exercise of judicial discretion," Jorn, 400 U.S. at 485, and make pellucid that the declaration of a mistrial in this case was spurred by a "high degree" of necessity, Washington, 434 U.S. at 506.

## V

We need go no further.  It bears emphasis that this case arose in the shadow of the pandemic.  Jury trials were just resuming, and courts had to step carefully.  For the reasons elucidated above, the cautious steps taken by the district court, culminating in its declaration of a mistrial, were comfortably within the encincture of its discretion.  Accordingly, the defendant's motion to dismiss was appropriately denied and the judgment of the district court is

**Affirmed**.

- 26 -